OPINION OF THE COURT
Simons, J.
The issue raised in this appeal is the scope of the duty of care owed to a professional athlete injured during a sporting event. The defendants are a coparticipant and his employer and the owner and operator of the sports facility in which the event took place.
Plaintiff Ronald J. Turcotte is a former jockey. Before his injury he had ridden over 22,000 races in his 17-year career and achieved international fame as the jockey aboard "Secretariat” when that horse won the "Triple Crown” races in 1973. On July 13, 1978 plaintiff was injured while riding in the eighth race at Belmont Park, a racetrack owned and operated by defendant New York Racing Association (NYRA). Plaintiff had been assigned the third pole position for the race on a horse named "Flag of Leyte Gulf’. Defendant jockey *436 Jeffrey Fell was in the second pole position riding "Small Raja”, a horse owned by defendant David P. Reynolds. On the other side of plaintiff, in the fourth position, was the horse "Walter Malone”. Seconds after the race began, Turcotte’s horse clipped the heels of "Walter Malone” and then tripped and fell, propelling plaintiff to the ground and causing him severe personal injuries which left him a paraplegic.
Plaintiffs, husband and wife, commenced this action against Jeffrey Fell, David P. Reynolds, NYRA and others no longer before the court. In their supplemental complaint, they charge that Fell is liable to them because guilty of common-law negligence and of violating the rules of the New York Racing and Wagering Board regulating "foul riding”,[1] that Reynolds is liable for Fell’s negligence under the doctrine of respondeat superior, and that defendant NYRA is liable because it "negligently failed to water and groom that portion of the racetrack near the starting gate or watered and groomed the same in an improper and careless manner” causing it to be unsafe.
 Special Term granted the motions of Fell and Reynolds for summary judgment, holding that Turcotte, by engaging in the sport of horseracing, relieved other participants of any duty of reasonable care with respect to known dangers or risks which inhere in that activity. Finding no allegations of Fell’s wanton, reckless, or intentional conduct, it dismissed the complaint as to Fell and Reynolds with leave to replead. NYRA subsequently moved for summary judgment and Special Term denied its motion because it found there were questions of fact concerning NYRA’s negligent maintenance of the track. On separate appeals, the Appellate Division affirmed, with one Justice dissenting from the order denying NYRA’s motion for summary judgment, and the *437 matters are before us as cross appeals by its leave. The order, should be affirmed as to defendants Fell and Reynolds and reversed as to defendant NYRA, and NYRA’s motion for summary judgment should be granted. The complaint should be dismissed as to all defendants because by participating in the race, plaintiff consented that the duty of care owed him by defendants was no more than a duty to avoid reckless or intentionally harmful conduct. Although a sport’s safety rules are an important consideration in determining the scope of plaintiff’s consent, the alleged violation of the rule in this case did not constitute reckless or intentional conduct and the complaint against defendants Fell and Reynolds was properly dismissed. NYRA’s duty is similarly measured by plaintiff’s consent to accept the risk of injuries that are known, apparent or reasonably foreseeable consequences of his participation in the race. Inasmuch as there are no factual issues concerning its liability, its motion for summary judgment should have been granted also.
I
It is fundamental that to recover in a negligence action a plaintiff must establish that the defendant owed him a duty to use reasonable care, and that it breached that duty (Akins v Glens Falls City School Dist., 53 NY2d 325, 333; Pulka v Edelman, 40 NY2d 781, 782; Kimbar v Estis, 1 NY2d 399, 405; Vogel v West Mountain Corp., 97 AD2d 46, 48). The statement that there is or is not a duty, however, "begs the essential question&emdash;whether the plaintiff’s interests are entitled to legal protection against the defendant’s conduct” (Prosser and Keeton, Torts § 53, at 357 [5th ed]; see also, De Angelis v Lutheran Med. Center, 58 NY2d 1053, 1055). Thus, while the determina- tion of the existence of a duty and the concomitant scope of that duty involve a consideration not only of the wrongfulness of the defendant’s action or inaction, they also necessitate an examination of plaintiff’s reasonable expectations of the care owed him by others. This is particularly true in professional sporting contests, which by their nature involve an elevated degree of danger. If a participant makes an informed estimate of the risks involved in the activity and willingly undertakes them, then there can be no liability if he is injured as a result of those risks. Traditionally, the
participant’s conduct was conveniently analyzed in terms of the defensive doctrine of assumption of assumption of *438 risk. With the enactment of the comparative negligence statute, however, assumption of risk is no longer an absolute defense (see, CPLR 1411, eff Sept. 1,1975). Thus, it has become necessary, and quite proper, when measuring a defendant’s duty to a plaintiff to consider the risks assumed by the plaintiff (see, Davidoff v Metropolitan Baseball Club, 61 NY2d 996, 997; Clapman v City of New York, 63 NY2d 669; Akins v Glens Falls City School Dist., 53 NY2d 325, 329, supra [duty owed by proprietors of sporting facilities to spectators]). The shift in analysis is proper because the "doctrine [of assumption of risk] deserves no separate existence (except for express assumption of risk) and is simply a confusing way of stating certain no-duty rules” (James, Assumption of Risk: Unhappy Reincarnation, 78 Yale LJ 185, 187-188). Accordingly, the analysis of care owed to plaintiff in the professional sporting event by a coparticipant and by the proprietor of the facility in which it takes place must be evaluated by considering the risks plaintiff assumed when he elected to participate in the event and how those assumed risks qualified defendants’ duty to him.
The risk assumed has been defined a number of ways but in its most basic sense it "means that the plaintiff, in advance, has given his * * * consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury * * * The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence” (Prosser and Keeton, Torts § 68, at 480-481 [5th ed]; 4 Harper, James & Gray, Torts § 21.0 et seq. [2d ed]; Restatement [Second] of Torts § 496A comments b, c; see also, Bohlen, Voluntary Assumption of Risk, 20 Harv L Rev 14 [assumption of risk is another way of finding no duty of care]; Comment, Assumption of Risk and Vicarious Liability in Personal Injury Actions Brought by Professional Athletes, 1980 Duke LJ 742).
The doctrine has been divided into several categories but as the term applies to sporting events it involves what commentators call "primary” assumption of risk. Risks in this category are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he *439 wishes. Defendant’s duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty (Prosser and Keeton, Torts § 68 [5th ed]; 4 Harper, James & Gray, Torts §21.1 [2d ed]). Plaintiff’s "consent” is not constructive consent; it is actual consent implied from the act of the electing to participate in the activity (see, Restatement [Second] of Torts § 892 [2]). When thus analyzed and applied, assumption of risk is not an absolute defense but a measure of the defendant’s duty of care and thus survives the enactment of the comparative fault statute (see, Prosser and Keeton, Torts § 68, at 481, n 10, 496-497 [5th ed]; 4 Harper, James & Gray, Torts § 21.0, at 188-189; § 21.3, at 223-224; § 21.5, at 238-239, n 17 [2d ed]; Restatement [Second] of Torts § 50 comment b; Assumption of Risk, op. cit., 1980 Duke LJ 742).
II
We turn then to an analysis of these two requirements — the nature and scope of plaintiff’s consent. It would be a rare thing, indeed, if the election of a professional athlete to participate in a sport at which he makes his living could be said to be involuntary. Plaintiff’s participation certainly was not involuntary in this case and thus we are concerned only with the scope of his consent.
As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation (see, Maddox v City of New York, 66 NY2d 270, 277-278). But while the courts have traditionally exercised great restraint in the belief that "the law should not place unreasonable burdens on the free and vigorous participation in sports”, they have recognized that organized, athletic competition does not exist in a vacuum. Some "of the restraints of civilization must accompany every athlete onto the playing field” (Nabozny v Barnhill, 31 Ill App 3d 212, 214-215, 334 NE2d 258, 260). Thus, the rule is qualified to the extent that participants do not consent to acts which are reckless or intentional (see, McGee v Board of Educ., 16 AD2d 99, lv denied 13 NY2d 596; see also, Nabozny v Barnhill, 31 Ill App 3d 212, 334 NE2d 258, supra; Hackbart v Cincinnati Bengals, 601 F2d 516, cert denied 444 US 931; Restatement *440 [Second] of Torts § 500; see generally, Note, Tort Liability in Professional Sports, 44 Alb L Rev 696, 697-699 [1980]; Comment, Torts: Athlete States Cause of Action for Injury During a Professional Football Game, 19 Washburn LJ 646, 648 [1980]; Beumler, Liability in Professional Sports: An Alternative to Violence?, 22 Ariz L Rev 919, 922 [1980]; Liability of Participant in Team Athletic Competition for Injury to or Death of Another Participant, Ann., 77 ALR3d 1300).
Whether a professional athlete should be held under this standard to have consented to the act or omission of a coparticipant which caused his injury involves consideration of a variety of factors including but not limited to: the ultimate purpose of the game and the method or methods of winning it; the relationship of defendant’s conduct to the game’s ultimate purpose, especially his conduct with respect to rules and customs whose purpose is to enhance the safety of the participants; and the equipment or animals involved in the playing of the game. The question of whether the consent was an informed one includes consideration of the participant’s knowledge and experience in the activity generally. Manifestly a professional athlete is more aware of the dangers of the activity, and presumably more willing to accept them in exchange for a salary, than is an amateur.
In this case plaintiff testified before trial to facts establishing that horse racing is a dangerous activity. A thoroughbred race horse is the result of years of breeding and that breeding, and all the horse’s training, are directed to building speed. A thoroughbred horse weighs about one-half ton and, during the course of the race, will reach speeds of 40 miles per hour or more. Jockeys weighing between 100 and 120 pounds, attempt to control these animals, all the while trying to prevail in a race whose very rules require them to exert a maximum effort to win. Plaintiff testified that every professional jockey had experiences when he was not able to keep a horse running on a straight line, or a horse would veer, or jump up on its hind legs, or go faster or slower than the jockey indicated. He further acknowledged that horses in a race do not run in prescribed lanes and it is lawful, under the rules of racing, for horses to move out of their starting lane to other parts of the track provided that the horse does not interfere with other horses when doing so. Indeed, during the course of a race, speeding horses lawfully and properly come within inches of other horses and frequently bump each other. Turcotte conceded that there is a fine line between what is *441 lawful and unlawful in the movement of a horse on the track during a race and that when and where a horse can lawfully change its position is a matter of judgment. Such dangers are inherent in the sport. Because they are recognized as such by plaintiff, the courts below properly held that he consented to relieve defendant Jeffrey Fell of the legal duty to use reasonable care to avoid crossing into his lane of travel.
Plaintiffs nonetheless contend that Fell’s alleged violation of 9 NYCRR 4035.2, which prohibits foul riding, is sufficient to sustain their complaint. They assert that the rule is a safety rule and that a participant does not accept or consent to the violation of the rules of a game even though the violation is foreseeable. They rely principally on Hackbart v Cincinnati Bengals (601 F2d 516, supra) in which the plaintiff was injured when intentionally struck in the neck from behind by an opposing football player after the play was over and Nabozny v Barnhill (31 Ill App 3d 212, 334 NE2d 258, supra) in which the plaintiff, playing goal tender in a high school soccer match, was injured after picking up the ball in a free kick zone when kicked in the head by player on an opposing team (see also, Restatement [Second] of Torts § 50 comment b).
The rules of the sport, however, do not necessarily limit the scope of the professional’s consent. Although the foul riding rule is a safety measure, it is not by its terms absolute for it establishes a spectrum of conduct and penalties, depending on whether the violation is careless or willful and whether the contact was the result of mutual fault. As the rule recognizes, bumping and jostling are normal incidents of the sport. They are not, as were the blows in Nabozny and Hackbart, flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose. Plaintiff does not claim that Fell intentionally or recklessly bumped him, he claims only that as a result of carelessness, Fell failed to control his mount as the horses raced for the lead and a preferred position on the track. While a participant’s "consent” to join in a sporting activity is not a waiver of all rules infractions, nonetheless a professional clearly understands the usual incidents of competition resulting from carelessness, particularly those which result from the customarily accepted method of playing the sport, and accepts them. They are within the known, apparent and foreseeable dangers of the sport and not actionable and thus plaintiffs’ complaint against defendant Fell was properly dismissed.
*442 Ill
Defendant Reynolds, owner of "Small Raja”, was sued under the doctrine of respondeat superior but the dismissal of the complaint against Fell, his employee, mandates dismissal of the complaint against the employer (see, Brown v Poritzky, 30 NY2d 289, 292; see generally, Note, Tort Liability in Professional Sports, 44 Alb L Rev 696, 706-717).
IV
The complaint against NYRA should also be dismissed. As the owner of the racetrack, it owed the same general duty to those using its property as to owners of real property generally, the duty to exercise "reasonable care under the circumstances” (Akins v Glens Falls City School Dist., 53 NY2d 325, 329, supra; Basso v Miller, 40 NY2d 233, 241; Scurti v City of New York, 40 NY2d 433, 437). Reasonable care may vary, however, depending upon the party seeking relief and his purpose in being on the premises (Basso v Miller, supra, p 241; see, Scaduto v State of New York, 86 AD2d 682, affd 56 NY2d 762; Liability for Injury or Death of Participant in Automobile or Horse Race at Public Track, Ann., 13 ALR4th 623; cf. Maddox v City of New York, 66 NY2d 270, supra). Thus, we noted in Akins that the duty of the owner of a baseball field to a spectator must be determined by considering plaintiffs status as a person who accepted certain risks of watching the game, and we held that the owner was required to provide only enough screening to protect a sufficient number of seats for those spectators who, under ordinary circumstances, desired to sit behind a screen (see also, Clapman v City of New York, 63 NY2d 669, supra; Davidoff v Metropolitan Baseball Club, 61 NY2d 996, supra).
NYRA’s duty to plaintiff is similarly measured by his position and purpose for being on the track on July 13 and the risks he accepted by being there. In deciding whether plaintiff consented to the conditions which existed at the time, the court should consider the nature of professional horseracing and the facilities used for it, the playing conditions under which horseracing is carried out, the frequency of the track’s use and the correlative ability of the owner to repair or refurbish the track, and the standards maintained by other similarly used facilities.
Plaintiffs charge that NYRA was negligent in failing to *443 water the "chute”, which leads to the main track, and "over-watering” the main track. Thus, they claim the horses had to run from the dry surface of the chute onto the overly watered, unsafe "cuppy” surface of the main track.[2] Plaintiff testified, however, that "cupping” conditions are common on racetracks and that he had experienced them before at Belmont Park and also at many other tracks. Indeed, he testified that he had never ridden on a track where he had not observed a cupping condition at one time or another. Thus, Turcotte’s participation in three prior races at this same track on the day of his injury, his ability to observe the condition of the track before the eighth race and his general knowledge and experience with cupping conditions and their prevalence establish that he was well aware of these conditions and the possible dangers from them and that he accepted the risk.
Plaintiffs rely on Cole v New York Racing Assn. (24 AD2d 993, affd, no opn 17 NY2d 761) in which the estate of a well-known jockey who was killed at the Aqueduct Race Track, brought a wrongful death action against the owner and operator of the track. During an "exhibition” workout between races, the jockey was thrown from his horse after it had collided with an infield track rail supported by metal posts. These metal posts were embedded in cylindrical concrete footings, and upon his fall the jockey struck his head and back on one of the footings and sustained an injury which ultimately resulted in his death. At trial, plaintiff successfully maintained that the owner’s negligent erection and maintenance of the concrete footings caused the death. Affirming the jury verdict for plaintiff, the Appellate Division noted the trial evidence that the elevated condition used for the footings was higher than the level of construction commonly used at other racetracks, that it was not necessary and that it had been used by defendant as an economy measure. The court held that based on this evidence the jury could properly find this deviation constituted negligence and that the defendant owner’s "claim that decedent’s assumption of the risks inherent in racing embraced the danger occasioned by the elevated condition of the footings was not supported by any evidence tending to show that the danger was 'ordinary and necessary’ to the sport and thus inherent in the activity itself’ (Cole v New York Racing Assn., supra, p 994). The decision, which pre *444 dated the enactment of CPLR article 14-A and analyzed the issue concerning inherent dangers of the sport of horseracing in terms of the defense of assumption of risk, is entirely consistent with the resolution of this case. The decedent in Cole could not have consented to the danger created by the footings because the danger of them did not "inhere” in the sport. Thus, the track proprietor was not entitled to the absolute defense of assumption of risk and its conduct in maintaining the premises was measured by a general negligence standard.
The parties have argued various interpretations of two of our recent decisions and their application to the facts of this case. Both are inapposite. Although the circumstances in the present case are similar to those in Maddox v City of New York (66 NY2d 270, supra), Maddox was decided under the law as it existed before enactment of the comparative negligence statute. The case involved a professional baseball player voluntarily playing on a field he knew was wet and soft. His claim for damages for injuries resulting when he stepped on a soft spot in the outfield was denied because the city was allowed to assert assumption of risk as a complete defense. Had that cause of action arisen under the present law, it could appropriately have been decided on the basis of duty under the same rules formulated here and with the same result.
Plaintiffs also contend that our decision in Arbegast v Board of Educ. (65 NY2d 161) mandates reversal of the order dismissing their complaint against defendants Fell and Reynolds. Arbegast dealt with a claim by a student teacher injured in a donkey basketball game, an activity of informal rules and uncertain risks, which had been scheduled as a fund-raising event for a senior high school class. Recovery was sought against the owner of the donkeys on the basis of common-law negligence and the absolute liability of the owner of an animal of vicious propensities. The court in that case denied plaintiff’s request to charge the principles of comparative negligence and the jury returned a verdict of no cause of action. Plaintiff appealed, claiming that denial of her requested instruction constituted reversible error, and the Appellate Division affirmed. In sustaining its order, we held that plaintiff’s testimony established an express assumption of the risks of the activity relieving defendant of liability and therefore that defendant’s motion to dismiss the complaint at the conclusion of her case should have been granted. That holding *445 is neither inconsistent with, nor applicable to, our decision in this case.
Accordingly, on appeal by plaintiffs, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative. On appeal by defendant NYRA, the order should be reversed, with costs, defendant’s motion for summary judgment granted and the certified question answered in the negative.
Chief Judge Wachtler and Judges Meyer, Kaye, Alexander, Titone and Hancock, Jr., concur.
On the appeal by plaintiffs, order affirmed, etc.
On the appeal by defendant NYRA, order reversed, etc.

. 9 NYCRR 4035.2 reads, in relevant part:
"Foul riding penalized, (a) When clear, a horse may be taken to any part of the course provided that crossing or weaving in front of contenders may constitute interference or intimidation for which the offender may be disciplined.
"(b) A horse crossing another so as actually to impede him is disqualified, unless the impeded horse was partly in fault or the crossing was wholly caused by the fault of some other horse or jockey.
"(c) If a horse or jockey jostles another horse, the aggressor may be disqualified, unless the impeding horse or his jockey was partly in fault or the jostle was wholly caused by the fault of some other horse or jockey.
"(d) If a jockey willfully strikes another horse or jockey or rides willfully or carelessly so as to injure another horse, which is in no way in fault, or so as to cause other horses to do so, his horse is disqualified.”

. "Cuppiness” is the tendency of wet track surface to stick to the underside of a horse’s hoof within the shoe.