Ima Jean MC DUFFIE, Administratrix of the Estate of John D. Mc Duffie, Jr., Plaintiff,

v.

WATKINS GLEN INTERNATIONAL, INC., National Association for Stock Car Racing, Inc. (NASCAR), International Motor Sports Association, and Sports Car Club of America, Defendants.

No. 92–CV–6536T.

United States District Court, W.D. New York.

Sept. 3, 1993.

Paul S. Edelman, Kreindler & Kreindler, New York City, for Ima Jean Mc Duffie.

William D. Eggers, Nixon, Hargrave, Devans & Doyle, Rochester, NY, Benjamin A. Fleischner, White, Fleischner, Fino & Wade, New York City, for Watkins Glen Intern., Inc. and National Ass'n for Stock Car Auto Racing, Inc. (NASCAR).

## DECISION AND ORDER

TELESCA, Chief Judge.

## INTRODUCTION

In this diversity action, the plaintiffs seek damages from the defendants NASCAR and Watkins Glen International, Inc. ("Watkins Glen")[1] for the wrongful death of John D. Mc Duffie, Jr. ("Mc Duffie") as a result of a fatal car crash that occurred when Mc Duffie was a participant at a race at the Watkins Glen Raceway. Mc Duffie, a veteran professional stock car driver, was killed while competing at the annual "Budweiser at the Glen" race on August 11, 1991. His widow alleges that her husband's death was caused by the defendants' negligence in knowingly providing a dangerous race track with substandard barriers. In addition, plaintiff alleges a

claim for willful misconduct by the defendants.

Defendants NASCAR and Watkins Glen now move for summary judgment and for the reasons set forth below, those motions are granted and the complaint is dismissed.

## BACKGROUND

Except as noted, the following material facts are not disputed by the parties. NASCAR is a Florida corporation engaged in the business of sanctioning stock car races. (Affidavit of Phillip Havens, at 1). NASCAR develops and implements rules and specifications so that races are organized and run in a fair, competitive environment. (Id.) NASCAR does not own or operate any racetracks, nor does it sponsor any races. (Id., at 2).

Defendant Watkins Glen owns a road race track in Watkins Glen, New York, which holds car races sanctioned by NASCAR and a variety of other sanctioning organizations. NASCAR has sanctioned races at Watkins Glen since 1986 and was the sanctioning body for the "Budweiser at the Glen" race held at Watkins Glen on August 11, 1991 when Mc Duffie was killed.

Watkins Glen is one of two "road courses" in the Winston Cup Series of races. The remaining 27 races are run on oval tracks. Unlike the oval courses used for most of the NASCAR races, a road course has an irregular configuration with straightaways, turns in each direction, and combination turns. (Defendants' Joint Rule 25 Statement, at ¶ 8).

Mc Duffie, 52 years old at the time of his death, had been a professional stock car driver for over 25-years. Each year of his participation in NASCAR racing, Mc Duffie completed and signed applications for NASCAR membership both as an owner and driver. These applications contained releases running in favor of NASCAR as well as the

---

1. On September 30, 1992, United States District Judge Pierre N. Leval of the Southern District of New York granted plaintiff's motion discontinuing this action against defendants International Motor Sports Association and Sports Car Club of America. Judge Leval subsequently granted the defendants' motion to transfer the case to the Western District of New York.

owners and operators of the tracks at NAS-CAR sanctioned events.[2]

As part of his NASCAR membership, Mc Duffie was provided with insurance benefits for medical expenses and a death benefit. Mc Duffie, in his application for the NAS-CAR benefit plan, agreed that any claim for accident injuries (including death), incurred in any NASCAR sanctioned stock car event, was limited to those provided in the benefit plan. (*See* Releases attached as Exhibits 5 and 6 to defendants' Joint Rule 25 Statement).

In addition, Mc Duffie signed event releases for his participation in each NASCAR event. In all, Mc Duffie signed four liability release forms in conjunction with the four-day "Budweiser at the Glen" event. He also paid a $340 entry fee. The General Counsel for NASCAR describes this fee as consisting of a $325 NASCAR inspection fee and a $15 fee paid to the track to defray the cost of waste disposal. (Havens Reply Affidavit). Plaintiff characterizes the fee as a "user fee" based upon the entry form (plaintiff's Exhibit 4), which states that a "$325 entry fee" must be paid for all cars when signing in at the track.

Mc Duffie competed in NASCAR events at Watkins Glen in the years 1986–1991, completing 328 laps and earning more than $16,000 in prize money. On August 8, 9 and 10, 1991, Mc Duffie ran practice laps and qualifying laps at the Raceway. It is beyond dispute that Mc Duffie was thoroughly familiar with the Watkins Glen track in particular, as well as the general risks of auto racing.[3]

As he approached the end of a long straightaway leading to Turn 5 during the fifth lap of the race on August 11, 1991, Mc Duffie's car sustained mechanical difficulties, which caused him to lose braking power and control of his vehicle. He collided with a car being driven by Jimmy Means, lost a tire, spun off the track across a large grassy area and hit the tire barrier outside Turn 5. After impact, the car overturned, and landed on its roof. Mc Duffie was killed instantly. A split second later the Means car crashed into the barrier at almost the same spot. Means climbed out of his car unhurt and summoned aid for Mc Duffie.

Plaintiff, while not disputing that Mc Duffie's car went out of control as a result of mechanical failure, nonetheless argues that Turn 5 was negligently designed, thus "encourag[ing] speeds for which it was not designed." (Edleman Affidavit, at 3). As proof, plaintiff cites the "inner loop" or "zig zag chicane" which was added to the long straightaway leading to Turn 5 after Mc Duffie's accident. Apparently, plaintiff is contending that had the chicane been in place on August 11, 1991, Mc Duffie's speed would have been slower when his car impacted the tire barrier.

Plaintiff also argues that the tire barrier itself was substandard and did not comply with international specifications and standards set by the "Federation Internationale de la Automobile", which establishes worldwide safety standards in racing car tournaments.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, togeth-

---

**2.** Paragraph 1 of each release provides that the NASCAR applicant "HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the ... sanctioning organization or any subdivision thereof, track operator [or] track owner ... for any and all loss or damage, and any claim or demands therefore on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the "releasees" or otherwise...."

Paragraph 3 of each release provides that the NASCAR applicant "HEREBY ASSUMES FULL RESPONSIBILITY FOR RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to

the negligence of "releasees" or otherwise while in or upon the restricted area and/or while competing ... in the EVENT(S)."

**3.** Mc Duffie was a participant in the 1989 Watkins Glen race when veteran driver Geoff Bodine crashed into the catch fence at Turn 5 and walked away without injury. In 1988, Mc Duffie himself was involved in a serious crash while competing in the qualifying race for the Daytona 500. His vehicle caught fire and he sustained serious burn injuries to his hands and body, and was hospitalized for several weeks.

er with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* Defendants move for summary judgment on the basis of Mc Duffie's assumption of risk, and on the basis of the releases he signed to obtain NASCAR membership and to compete in the race.

## II. Assumption of Risk By a Professional

The Court of Appeals in the leading case of *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), firmly established the doctrine that primary assumption of risk, in the context of professional sports (there, horse racing), is a complete defense to negligence claims brought by the participant against the owner of the sport facility or the promoter. The firmly established principle in *Turcotte* is that "participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation." 68 N.Y.2d at 439, 510 N.Y.S.2d 49, 502 N.E.2d 964. The doctrine applies "not only to any facet inherent in the activity, but also to any open and obvious condition of the place where the activity is carried on, provided the injured party, given his skill and experience at the activity, knew of the injury causing defect and appreciated the resultant risk." *Owen v. R.J.S. Safety Equip.*, 169 A.D.2d 150, 155, 572 N.Y.S.2d 390 (3d Dep't 1991), *aff'd*, 79 N.Y.2d 967, 582 N.Y.S.2d 998, 591 N.E.2d 1184 (1992).

Defendants argue that the risks of racing at Watkins Glen in general, and around Turn 5 in particular, were open and obvious. They contend that it is beyond doubt that Mc Duffie, given his experience at Watkins Glen, was well aware of the conditions at Turn 5, including the speed at which Turn 5 is approached, and thus he voluntarily assumed the risks of racing there.

In opposing summary judgment, plaintiff relies on a post-*Turcotte* case, *Owen v. R.J.S. Safety Equip., supra.* In *Owen*, plaintiff's decedent was killed when his race car left the track and struck a retaining wall during a race at the Orange County Fair Speedway, where the decedent had participated in races for a number of years. Plaintiff alleged that the design and construction of the retaining wall failed to direct the decedent's car back onto the track and caused the car to become airborne, thereby increasing the risk of serious injury or death. The affidavits of plaintiff's experts indicated that the contour of the track's retaining wall, as well as the design of its guardrail and the placement of barrels near the guardrail, "was unique and created a dangerous condition over and above the usual dangers that are inherent in the sport of auto racing." 79 N.Y.2d at 970, 582 N.Y.S.2d 998, 591 N.E.2d 1184. Despite the decedent's status as an experienced racer who assumed the risks of injury that ordinarily attend auto races, the Court of Appeals held that

> [plaintiff's] affidavits were sufficient to create a triable question of fact as to whether defendants' alleged negligence, if any, engendered additional risks that "do not inhere in the sport" and, if so, whether the decedent should be deemed to have assumed those risks by voluntarily participating in the race (citation omitted).

*Id.*

Seeking to raise similar triable issues of fact in the instant case, plaintiff submitted the affidavit of John Fitch, a former professional race car driver who claims that he "know[s] first hand many of the race tracks of the world, including Watkins Glen." (Fitch Affidavit, at 1). Fitch contends that

> [i]n 1991, the Watkins Glen race track had a configuration at Turn 5 that was unduly hazardous because it was a very high speed curve with inadequate escape or run-off area or other energy-absorbing provisions. The tire barrier was below accepted standards and was placed too close to the track proper, so that the race

cars could not slow down enough before hitting the barrier.

*Id.,* at 2. Fitch also describes the chicane which was subsequently added as being "[a]mong the several remedies *recognized by the racing fraternity[ ]* which would have reduced the exposure of drivers...." *Id.,* emphasis mine. In addition, he opines that the Watkins Glen track "prior to and on 11 August 1991, was demonstrably unsafe with regard to the *known* remedies which could have been implemented." *Id.,* at 5., emphasis mine. The remainder of the information contained in his affidavit is not derived from personal knowledge or investigation, but from newspaper accounts discussing the accident and proposed changes which could have been implemented. Fitch further opines that "I doubt that Mr. Mc Duffie would have realized how sub-standard this race track was in terms of driver safety." *Id.*

Fitch thus confirms that the risks posed by the configuration of Turn 5 and by the location of the tire barrier, as well as the "remedies" to reduce such risks, were well known prior to the Budweiser at the Glen race. Indeed, the newspaper articles submitted by the plaintiff also indicate that safety issues concerning Turn 5 were widely discussed prior to the race on August 11, 1991, especially after driver Tom Kendall's crash on June 30, 1991. (*See* Plaintiff's Exhibit 1).

On the record now before me, it is inconceivable that a driver with Mc Duffie's extensive experience at the Glen would be unaware of the reasonably foreseeable risks attendant to Turn 5, such risks being "open and obvious" to any driver who had taken a practice lap. Fitch's unsupported, conclusory statement regarding the extent of Mc Duffie's knowledge is insufficient to raise a triable issue of fact as to whether Mc Duffie voluntarily assumed the risks of racing at Watkins Glen.

Plaintiffs' reliance upon *Owen* is misplaced because the facts of the instant case clearly demonstrate that the proximate cause of Mc Duffie's accident was not a negligently designed barrier but a mechanical failure which caused him to lose control of his vehicle while traveling at a high rate of speed. In *Owen,* plaintiff's experts alleged that the negligently designed barrier caused the decedent's automobile to become airborne, thus increasing significantly the risk of serious injury or death to a driver striking the wall. While the decedent in *Owen* assumed the risks associated with racing on the track at a high rate of speed, the court concluded that he did not perceive the enhanced risk of becoming airborne once his car crashed into the barrier because of its negligent, faulty design.

Here, although neither plaintiff nor her expert dispute the fact that Mc Duffie could not control his car or reduce his speed due to a mechanical failure, they argue instead that the defendants were negligent (1) in the faulty design of the track which permitted him to go too fast thus subjecting him to an unperceived danger and (2) in providing an inadequate barrier to prevent injury once his car went out of control. They would charge defendants with acts of negligence which could not have been reasonably foreseeable. Mc Duffie voluntarily assumed the risk of approaching Turn 5 at the fastest speed he could attain to maintain and possibly improve his position in the race. He was well aware of the dangers associated with auto racing because he had survived a prior serious accident. The possibility of losing control of his race vehicle at a high rate of speed is an inherent foreseeable risk in auto racing. The proximate cause of this accident was a mechanical failure sustained by his vehicle which caused him to lose control while traveling at a high rate of speed.

Moreover, plaintiffs' expert Fitch does not substantiate the basis in support of the opinion that the barrier was below accepted standards, except to say that it "was placed too close to the track so that race cars could not slow down enough before hitting it." *Id.,* at 2. However, Mc Duffie, given his experience at the track, was aware of the barrier's location with reference to the track, yet chose to race anyway. Again, the record reveals that the features which Fitch describes as substandard were not hidden from view, but were "open and obvious" to someone like Mc Duffie who had raced at Watkins Glen many times. The opinions held by plaintiffs' expert Fitch were not shared by other noted professional race car drivers familiar with

the Watkins Glen race track. In an article published after Mc Duffie's death, driver Geoff Bodine, who previously crashed into Turn 5, "emphatically" stated that "the track is not unsafe." (Plaintiff's Exhibit 1, Star Gazette of 8/12/91). Also, driver Darrin Brassfield, on the day before the accident, noted that "every safety measure has a pro and a con ... It's tough to say if any one way is better than the other because every accident is different." (*Id.*, Star Gazette of 11/10/91). All of the relevant and material facts now before me clearly indicate that Mc Duffie chose to assume the reasonably foreseeable risks attendant to racing at Watkins Glen on August 11, 1991. Having assumed the risks, it follows that plaintiffs cannot call upon others to compensate them from the harm thus sustained.

### III. Releases Signed by Mc Duffie

In 1976, the New York Legislature enacted § 5–326 of the General Obligations Law to provide that:

> [e]very covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner or operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

(L.1976, ch. 414, § 1).

■ Plaintiff argues that § 5–326 renders the releases signed by Mc Duffie void as against public policy because he was a "user" of a recreational facility within the meaning of the statute. Plaintiff relies heavily on the fact that Mc Duffie paid an admission fee to enter the race. However, the only proof submitted by plaintiff on this issue is the entry form itself, which characterizes the fee

merely as an "entry" fee per car of $325. This was not an entry fee to see the race as a spectator but rather, to participate in the race as a professional racer for profit. Defendants' affidavits establish that the fee was not paid for use of the racetrack, but for a pre-race NASCAR inspection to ensure compliance with regulations and safety standards.

Moreover, I find that the issue of whether a professional acting in furtherance of the enterprise can be a "user" is controlled by the Second Department's decision in *Lago v. Krollage*, 157 A.D.2d 49, 554 N.Y.S.2d 633 (1990), wherein the court held that an auto mechanic killed while working at a stock car race was not a "user" of the facilities within the statutory intendment. As such, the General Obligations Law did not void the NASCAR membership release signed by the decedent.

The holding in *Lago* applies as well to a professional race car driver whose participation in the race was in furtherance of the speedway venture. The legislative history of § 5–326 establishes that "it was a consumer protection measure based upon an assessment that members of the general public patronizing proprietary recreational and amusement facilities are commonly either entirely unaware of the existence of exculpatory clauses in admission tickets or membership applications or are unappreciative of the legal consequences thereof." *Owen*, 169 A.D.2d at 156, 572 N.Y.S.2d 390, *citing* Governor's Bill Jacket, L. 1976, ch. 414, § 1. The record now before me reveals that Mc Duffie was not a patron user of the recreational establishment involved here. Rather, he was an experienced participant who made his living from racing, and as such, knowingly waived suit in order to engage in his profession for profit. Accordingly, I find § 5–326 of the General Obligations Law to be inapplicable in this case and does not void the NASCAR membership release signed by Mc Duffie. Summary judgment is therefore granted in defendants' favor on the basis of the releases Mc Duffie signed, which preclude his representative from bringing this lawsuit.

## IV. Willful Misconduct

Plaintiff also alleges willful misconduct on the defendants' part. Willful misconduct means "a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others." New York Pattern Jury Instructions, § 2:10A, at 87 (Cum.Supp., December 1992); *see also Gardner v. Owasco Riv. Ry,* 142 A.D.2d 61, 64, 534 N.Y.S.2d 819 (3rd Dep't 1988) (to prove willful or malicious conduct, plaintiff is required to show "an intentional act of unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm would result"). There simply is no proof submitted by plaintiffs to substantiate this claim let alone create a material triable issue of fact. Certainly the opinions offered by plaintiffs' expert Fitch do not support a claim for willful misconduct let alone negligence on behalf of either defendant. Accordingly, summary judgment in defendants' favor dismissing this claim is granted.

### CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment are granted on the basis that plaintiff's decedent was fully aware of the risks of participating in the race at Watkins Glen, and also on the basis that he contractually waived his, or his representative's, right to bring this lawsuit.

ALL OF THE ABOVE IS SO ORDERED.