OPINION OF THE COURT
Martin Schoenfeld, J.
In this action plaintiff Jeffrey Powell alleges that loud music played by the rock and roll performer John Fogerty permanently damaged the hearing in plaintiff’s left ear. The various defendant parties, who were involved one way or another in presenting the subject concert, now move and cross-move for summary judgment on a variety of grounds. For the reasons set forth herein, the motions and cross motion are granted. Basic Background
“I hear hurricanes ablowing.
“I know the end is coming soon.
“I fear rivers over flowing.
“I hear the voice of rage and ruin.” (J.C. Fogerty, Bad Moon Rising.)
For purposes of the instant motion, the events that took place at the concert, and the surrounding circumstances, are not in dispute. At the time in issue plaintiff was a 51-year-old attorney. He had previously attended a number of rock and roll concerts, albeit quite some time ago, and had noticed a ringing in his ears for limited periods of time after some of them. When asked if he was aware that loud music could cause “hearing damage,” he testified (opposition exhibit E at 35-36) that he “was aware that you might have a temporary buzz or a ring ** * * that followed loud concerts but it always went away.” Similarly, he testified (id. at 17) about other concerts he had attended that “from time to time there would be a little * * * buzzing or a hissing sound that would last for a short period of time after [a] concert and then it would go away.”
On June 2, 1997, he and three companions went to hear Fogerty, the singer/songwriter/guitarist for the late Creedence Clearwater Revival, perform as a solo act at the Hammerstein Ballroom, 8th Avenue and 34th Street, New York, New York. Mr. Fogerty was accompanied by a backup band consisting of guitar, bass, and drums. The seating was “open,” as opposed to “assigned,” and plaintiff and his party took seats in the front row of the mezzanine. Plaintiff considered the first act, “The Fairfield Four,” a “rock/gospel/country” group, “unnecessarily *849 loud,” and “louder than the other concerts that I had [years ago] attended.” When Fogerty began his set, plaintiff found the noise level intolerable, and during the first or the second song he retreated to an area of the building outside the ballroom, but still within hearing range of the music. He made an unavailing attempt or two to inform defendants’ personnel that he thought the music was too loud. He may have returned briefly to his companions once or twice. The companions also found the music “too loud,” and some or all of them stuffed tissue and/or their fingers in their ears during the concert.
Nobody knows just how loud the music was or was not on the night in question.[1] One of defendants’ employees testified (Bennett examination before trial, opposition exhibit H, at 168) that a “reasonable estimate” of the volume of the first song of the Fogerty set (apparently including the ambient noise of the crowd) was 106 decibels.[2] One of plaintiff’s experts states (opposition exhibit C) that “[e]xposure to this level of sound for V2 hour to 1 hour may be unsafe.” At another point, plaintiff claims (opposition mem at 8 n) that “4 minutes would be the maximum permissible exposure to noise at a level of 105 decibels.”
There is no evidence, aside from the testimony of plaintiff and his companions, that the concert, or the short tour of which it was part, was unusually loud, or that other people, or a particular number thereof, complained, or that anyone else suffered hearing damage or sued therefor. However, for purposes of the instant motion, this court will assume that the loud volume of the concert caused plaintiff to suffer some permanent hearing impairment.[3] Discussion
“Heard the singers playin’,
*850 “How we cheered for more.
“The crowd had rushed together,
“Tryin’ to keep warm.
“Still the rain kept pourin’,
“Failin’ on my ears.
“And I wonder, Still I wonder Who’ll stop the Rain.” (J.C. Fogerty, Who’ll Stop the Rain.)
Even assuming that the concert impaired plaintiffs hearing, the instant action must be dismissed for two related reasons. First, there is no standard of care by which a jury could determine on the evidence presented that defendants had breached a duty owed to plaintiff. Without knowing what is “too loud,” and without knowing how loud the concert actually was, a jury would have to engage in double speculation to conclude that defendants’ music was “unreasonably loud.”
Second, the doctrine of primary assumption of risk bars the instant action. As stated by the Court of Appeals in Turcotte v Fell (68 NY2d 432 [1986] [dismissing claims by jockey who fell from horse during race]), and worth quoting at some length:
“The risk assumed * * * ‘means that the plaintiff, in advance, has given his * * * consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury * * * The result is that the defendant is relieved of a legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.’
“The doctrine has been divided into several categories but as the term applies to sporting events it involves what commentators call ‘primary’ assumption of risk. Risks in this category are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he wishes. Defendant’s duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and *851 defendant has performed its duty. Plaintiffs ‘consent’ is not constructive consent; it is actual consent implied from the act of the electing to participate in the activity. When thus analyzed and applied, assumption of risk is not an absolute defense but a measure of the defendant’s duty of care and thus survives the enactment of * * * comparative fault * * *.” (Id. at 438-439, quoting Prosser and Keeton, Torts § 68, at 480-481 [5th ed] [citations omitted].)
In a similar vein, the Court of Appeals noted that “by engaging in a sport or recreational activity, a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation.” (Morgan v State of New York, 90 NY2d 471, 484 [1997].)
This court finds that the “primary assumption of risk” doctrine is appropriate in concert cases and is applicable here. That “loud music” can cause hearing impairment is “perfectly obvious” and “commonly appreciated.” In making this determination, this court finds that an objective, reasonable person standard applies, and that an objective, reasonable, 51-year-old lawyer, particularly one who has experienced ringing in his ears after prior concerts, would know that loud music can cause hearing impairment.[4]
Plaintiff argues that the conditions were not as safe as they appeared to be because the ballroom had recently been stripped of some drapes and, thus, as one of defendants’ employees testified, the room was “vibrant.” However, even assuming defendants did not simply compensate for this by rotating their knobs a notch or two counterclockwise during the de rigeur sound checks that precede every concert, plaintiff was in a position to hear exactly how loud the music was. Indeed, plaintiff had noticed that the opening act, apparently an a capella singing group, was rather loud. He elected to stay for the headliner, complete with guitars, bass, and drums, obviously aware that the volume would only rise.
Finally, on a more general level, this court notes that one purpose of decisional, as well as statutory, law is to inform citizens of what they can expect from our system of justice, so that they can arrange their affairs and act accordingly. Often, *852 the normal, everyday activities of citizens inform the decisions of judges, and vice versa. Loud rock and roll concerts (and other events, such as stadium athletic contests, at which rock and roll is blared) have been a ubiquitous fixture on the American landscape for decades now. Tens, if not hundreds, of millions of people have had their senses (aural and otherwise) assaulted at such events. If the overall understanding between patrons and producers was that “excessive” noise by the latter is actionable, one would expect a long list of cases in which claims by the former were sustained. Instead, this court’s attention has been drawn to one, somewhat distinguishable, case: Bootz v Crown Leisure Corp. (569 So 2d 842 [Fla 1990]), in which the patron of a bar was allowed to proceed with a suit alleging that her hearing was impaired because the disc jockey varied the volume of a song he was playing to accentuate a certain refrain (“hey bartender”). Surely this dramatic absence of litigation, in what is perceived to be such a litigious nation, speaks volumes to the fact that the principle applicable to the social compact governing the volume at rock and roll concerts is caveat emptor.
This court is well aware of the suffering that a hearing loss and related conditions such as tinnitus can cause. However, in the final analysis, whether concerts are “too loud” should be decided by the Legislature[5] or the marketplace,[6] not by the courts. Litigation by an “eggshell ear” plaintiff is not an appropriate means to impose an unlegislated noise code upon performers who want to perform a certain way, and their legions of screaming fans, who want them to do just that. Lawyers learn in law school that a plaintiff with an “eggshell skull” can collect from an assailant who inflicts a slight blow to the head. However, the instant plaintiff is in the position of an “eggshell skull plaintiff” who chose to stand in a thunderous hailstorm, and who, unfortunately, cannot now be heard to complain.
*853 Conclusion
Thus, for the reasons set forth herein, the instant motions and cross motion for summary judgment are, in all respects, granted.

. Although not necessary to the instant decision, this court notes that Mr. Fogerty, whose sound might be characterized as bluesy, good time, roots rock, has never been thought of as particularly loud, in contrast to, say, such 1960s groups as The Who, Led Zeppelin, and the Rolling Stones, or their presumably even louder 1970s progeny, such as Black Sabbath, Kiss or Aerosmith. Plaintiff testified (opposition exhibit E at 34) that he, himself, did not consider Mr. Fogerty to be a “loud artist,” a category in which plaintiff would have included the Grateful Dead and the Rolling Stones.

. This interpretation is the one most favorable to plaintiff, as he is the party opposing a motion for summary judgment.

. This will be assumed despite the fact that, three months after the concert, plaintiffs doctor wrote (Metropolitan moving exhibit L at 2) that the doctor “could not distinguish [between] a spontaneous/ideopathic event [and a] noise induced [hearing loss], although the [hearing loss] did not seem to fit the typical noise induced pattern.”

. Many rock and roll performers, including, perhaps most famously, Peter Townsend, guitarist of The Who, have publicized the hearing loss that their own music has caused them. (See David G. Schall, M.D., Unsafe Sounds, EX Otoscope [No. 5], at 2 [Fall 1994].)

. Which, as to stadiums and concert halls, etc., has decided not to act, or at least has not decided to act. (Cf. Ward v Rock Against Racism, 491 US 781 [1989] [6-3 holding that New York City can regulate volume of amplified music in Central Park so that performances are satisfactory to audience without intruding upon other park users or others who live in vicinity].)

. Nobody is forced to attend rock and roll concerts. The plaintiff herein could have left the ballroom in less time than the four (or 30) minutes he claims it would take for the alleged decibel level of the concert to cause hearing loss. Had he demanded, and been refused, a refund, he well might have had a viable breach of contract cause of action.