■ NICOLE L. ZIEGELMEYER, Appellant, v UNITED STATES OLYMPIC COMMITTEE et al., Respondents. [813 NYS2d 817]—

Carpinello, J. Appeal from an order of the Supreme Court (Spargo, J.), entered December 6, 2004 in Greene County, which granted defendants' motions for summary judgment.

Plaintiff, a self professed ''very experienced and highly proficient'' speedskater and two-time Olympic medal winner, was practicing at the 1980 Olympic indoor rink in the Village of Lake Placid, Essex County, when she fell on the ice, hit the fiberglass boards surrounding the rink and injured her spine. Although pads had been placed on the boards, plaintiff fell in such a manner that her feet lifted them up causing her hip to strike the boards directly. She asserts in this negligence action that certain defendants are liable for her injuries based upon their failure to install the pads in accordance with applicable international standards.[1] After discovery, Supreme Court granted defendants' motions for summary judgment and dismissed the complaint, finding that plaintiff had assumed the risk of her injury. Plaintiff appeals.

An athlete who voluntarily participates in a sport ''consents to those commonly appreciated risks which are inherent in and

---

1. Plaintiff was acutely aware of the manner in which the pads were affixed to the boards during these practice sessions since she herself had participated in that very process on prior occasions.

arise out of the nature of the sport generally and flow from such participation" (*Morgan v State of New York*, 90 NY2d 471, 484 [1997]). The "duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty" (*Turcotte v Fell*, 68 NY2d 432, 439 [1986] [citations omitted]). "[I]t is not necessary that the injured plaintiff foresee the exact manner in which . . . her injury occurred" (*Tremblay v West Experience*, 296 AD2d 780, 781 [2002]). Moreover, "a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular sport" (*Maddox v City of New York*, 66 NY2d 270, 278 [1985]).

In an effort to avoid application of the assumption of risk doctrine, plaintiff relies on the principle that a damaged or dangerous safety feature is not an inherent risk of a sport (*see Morgan v State of New York, supra* at 488). This record does not establish that the pads were either damaged or defective. No factual affidavit was submitted by plaintiff disputing the affidavit of a fellow speedskater and coach to the effect that falling speedskaters often strike the pads in such a fashion as to cause the pads to move out of position on impact. Even acknowledging the conflicting accounts as to the method by which the pads were affixed to the boards, in the absence of a denial that the pads can move in the fashion in which this accident occurred,[2] we cannot say that the subject pads were defective or dangerous such that plaintiff's accident was anything other than an inherent risk of her sport.

In light of our ruling, defendants' alternative arguments for affirmance are academic.

Mercure and Mugglin, JJ., concur.

Cardona, P.J. (dissenting). We respectfully dissent. In our view, the record contains arguable questions of fact as to whether the protective pads placed over the boards on the day of the accident, October 9, 1997, were properly installed in accordance with the applicable standards set forth by the International Skating Union (hereinafter ISU) and in the Special Regulations for Speed Skating and Short Track Speed

---

**2.** The dissent's lengthy discussion of the differences in the manner of affixing the pads for practices versus competitions is a classic "red herring." The manner by which the pads may or may not have been affixed to the *top* of the boards simply has nothing to do with the manner in which this accident occurred. In either event, the pads were never affixed at the bottom at the ice surface.

Skating. Accordingly, we believe that defendants' motions for summary judgment should have been denied.

Specifically, the record indicates that the 1980 Olympic indoor rink was maintained and operated by the Olympic Regional Development Authority (hereinafter ORDA). By a June 1994 agreement, ORDA and defendant United States Olympic Committee (hereinafter USOC) agreed, among other things, that ORDA would maintain the facility for the USOC's athletes "in a condition acceptable by International Federation safety standards."[1] Significantly, the record contains several references to ISU communication No. 1019, which, in the section describing pad placement, states: "Pads *must* be attached *to the boards* and to each other" (emphasis added). Similarly, the Special Regulations for Speed Skating and Short Track Speed Skating for the years 1996 to 1998 state, among other things: "Full height *mats must be attached to the boards* and to each other" (emphasis added). Neither of these documents provides that the safety rules are different for practices, as opposed to competitions.

The applicability and relevance of the above safety rules was confirmed by the deposition testimony of ORDA employee Dennis Allen. He stated that the pads were regularly placed at the rink by ORDA employees, although the skaters sometimes assisted in bringing the pads to the ice. He testified that if the skating coaches were unhappy with the pad placement, ORDA employees would be informed and an adjustment would be made. According to Allen, the pads were fastened to each other in compliance with ISU rules and, additionally, the pads were attached to the boards by, first, picking "the plexiglass up," then sliding ropes attached to the back of the pad through the opening and tying the pad to the board. Notably, defendant Patrick Wentland, who, at the time of plaintiff's accident was an assistant national coach of defendant United States Speed Skating, acknowledged during his deposition that he had seen ropes attached to the pads "fed underneath the [p]lexiglass wall and

---

1. We note that, while USOC disclaims any liability, contending in its brief that it was ORDA which "was responsible for installing the pads prior to the beginning of practice" and that it was actually the obligation of defendant United States Speed Skating to "ensure that the rink met the technical standards as set forth by the [ISU]," issues pertaining to ultimate responsibility or indemnification cannot be determined on this record. However, it is clear that there is no proof that it was, in fact, *plaintiff's* duty to ensure that pads were installed in accordance with the applicable rules.

tied to something in the back."[2] However, he stated that those ropes were "used sometimes for competitions, *but for practice we never used those*" (emphasis added). Instead, he said that if ORDA did not have the pads set up for a practice, he told the skaters how to set up the pads so that they were "all connected to each other" by velcro strips. Plaintiff also testified that when skaters were directed by coaches to set up the pads, they were told to attach them to each other. She also stated that, prior to her accident, she had no idea that there was anything unsafe about how the padding was set up.[3]

Significantly, plaintiff's assertion that, on the day of her accident, the pads were only connected to each other and not attached to the boards is uncontradicted in this record, and that failure bears a direct relationship to plaintiff's claim that she was injured because an unattached pad lifted up, causing her hip to directly strike the unpadded board.[4] Although it is clear that defendants were aware of the rules, which require that the pads be *attached* to the boards and not just to each other, a fair inference may be drawn from the proof that a more casual procedure in applying the rules was sometimes followed or tacitly permitted by the coaches and officials when the skaters were using the rink for practices. It appears that the coaches, who had access to the rules of safe pad placement cited above, were aware that pads often became displaced when struck by skat-

---

**2.** Since the bottom of the plexiglass is approximately at the midpoint of the boards and the record testimony established that the ropes were fed *underneath* the plexiglass when they were tied to the boards, we do not believe that the record supports a conclusion that the pads, when attached to the boards for competitions, were tied at the top.

Furthermore, although the majority references the fact that the safety pads cannot be affixed to the *bottom* of the boards, we do not find that circumstance to be relevant herein. Instead, viewing the evidence in the light most favorable to plaintiff, we find triable issues as to whether the failure to tie the pads to the boards in accordance with the safety rules, and in the manner they could be secured, rendered the pads less stable and more likely to move to the side and leave the boards exposed if struck by a skater.

**3.** Plaintiff testified that, while she knew she had received information as to the proper safety equipment that skaters should use, she was not sure if she had ever been provided with the rules for protective padding. She said that skaters were shown by the coaches how to set up the pads for practices and the skaters did what the coaches told them to do.

**4.** Eric Flaim, an eyewitness to the accident, testified that, after plaintiff hit the pads, he noticed that the "pads were disrupted, they moved, slid to the side a little bit."

ers.[5] Moreover, we do not find that such claimed knowledge on the part of coaches establishes that *skaters* assumed the risk of striking unpadded boards. Even if there was proof that the lifting up of pads was a common occurrence at practices, such a circumstance would be irrelevant in the absence of proof that a lesser safety standard was acceptable for practices or that skaters were aware that pads were supposed to be *attached* to the boards in accordance with the rules, but they nevertheless chose to skate when they were only attached to each other. In the case at bar, however, there is no proof that skaters were aware that the coaches' instructions as to pad placement during practices differed from the safety rules or that they, as opposed to defendants, were in any way responsible for implementation of the rules.

Given the above proof, summary judgment in defendants' favor at this juncture is tantamount to a finding that, as a matter of law, the safety requirement that pads be *attached* to the boards and not just to each other is unnecessary for practices, a result that is not supported by the language of the rules or the testimony concerning the speeds employed at practices. Consequently, we find issues of fact as to, among other things, compliance with the safety rules and whether, at the time of plaintiff's accident, defendants met their duty of making the conditions at the 1980 Olympic indoor rink as safe as they appeared to be (*see Turcotte v Fell*, 68 NY2d 432, 439 [1986]), and/or if the failure to attach the pads to the boards on the date of the accident created a dangerous condition " 'over and above the usual dangers that are inherent in the sport' " (*Morgan v State of New York*, 90 NY2d 471, 485 [1997], quoting *Owen v R.J.S. Safety Equip.*, 79 NY2d 967, 970 [1992]).

Spain, J., concurs. Ordered that the order is affirmed, with one bill of costs.

5.  While the majority finds significant the fact that plaintiff did not submit an affidavit disputing testimony by one of the defendants and another coach that pads were often "moved out of position on impact," we note that, in her deposition testimony attached to defendants' moving papers, plaintiff stated that she had "never seen somebody go under, during a fall, underneath the padding."