[655 NYS2d 484]

Jose Barretto, Respondent, v City of New York, Defendant, and New York City Board of Education, Appellant.

First Department, April 1, 1997

## APPEARANCES OF COUNSEL

*Margaret G. King* of counsel (*Barry P. Schwartz* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

*Stephen B. Toner* of counsel (*Dan Schiavetta, Jr.,* on the brief; *Murphy & Higgins,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

The New York City Board of Education appeals from a judgment awarding damages to plaintiff, an $18^1/_2$-year-old high school senior and member of the school's volleyball team, who, on April 12, 1988, injured his spine and suffered paralysis from the chest down when, in the coach's absence, during an equipment setup prior to the start of practice, he attempted a gymnastic dive over a half-raised volleyball net onto a mat, landing, not on his hands, as he intended, but on his head. The revised judgment awarded plaintiff approximately $15,000,000 in damages, past and future, after a verdict finding the Board 80% and plaintiff 20% responsible for causing the injury.

The trial evidence shows the following. Sometime after the March 1, 1988 start of the spring season, plaintiff, who had previously played volleyball in the Dominican Republic, where he was born, as well as in the regular gym class, joined the extracurricular, after-school varsity volleyball team at Richmond Hill High School. He did so after signing a consent form acknowledging his understanding that the Board would "not assume responsibility should an accident occur * * * during participation in any phase of the athletic program." According to plaintiff, although advised by the coach to be punctual and dressed properly, he was never given instructions as to proper gymnasium behavior. Plaintiff took part in his first practice session with the team on March 21, 1988.

On the day of the accident, at about 3:30 P.M., plaintiff and Pedro Russo, as well as five or six other members of the 10-man team, assembled outside the gym. The coach arrived sometime after 3:30 P.M. and unlocked the gym and locker room on the floor below. After the players had changed, the

coach unlocked the gym closet containing the volleyball equipment, including two poles and a net, and, placing the team captains in charge, told the players to put up the net. The coach then left, either to change his clothes, as one of the players testified, or, as he testified, to find volleyballs. Before leaving, he warned the players "not to horse around with the volleyballs".

Some of the players, including plaintiff and Russo, then set up the net. After screwing the poles into the holes in the floor and attaching cables from the poles to the floor to secure the poles, they put the cables from the net through hoops on the poles, attached them to the cranking mechanism and began to crank up the net. When the net was one-half raised, they stopped cranking. At that point, the top of the net at its lowest point was three or four feet off the ground.

While the other team members were either sitting or playing with the volleyballs, Russo, who had gone to the back of the gym with a ball, ran, from a distance of 30 or 40 feet, toward the net, intending to jump over it. When he reached the net, however, he stopped, explaining, "Something told me not to jump, so I stopped right there." Plaintiff volunteered, "I can do it." He then brought over gym mats from the side of the gym and placed them under the net. Plaintiff conceded that he had never seen a mat under a volleyball net; nor had he ever observed anyone attempt to dive over one. Several team members warned plaintiff against jumping over the net. A teammate, Cruz, yelled at both plaintiff and Russo to stop "fooling around", but they "didn't mind him". Russo also tried to stop plaintiff, but as he explained later, "[I]t was too late, when I saw him, he already was [lying] on the other side of the net."

Plaintiff, from a distance of 30 to 35 feet, ran toward the net and jumped head first so that he "could land on [his] hands and roll on top of the mat." Instead, he caught his waist on the top of the net, and, unable to grab the net when he tried, landed on his head after the cable gave and his feet flipped upwards. Plaintiff had never attempted such a dive in any high school gym class; he had, however, performed such a maneuver when he was nine or ten years old and enrolled in a karate class in the Dominican Republic. When he performed the dive there, it was not over a volleyball net but usually over a barrel or over other students. In those instances, his karate teacher acted as a "spotter" to assure that "you wouldn't hit your head or something like that with the floor."

The school's assistant athletic director was the first adult to respond to the accident, followed, a few minutes later, by the

coach. The police were called at 3:53 P.M.; an ambulance was dispatched at 4:02 P.M. Both plaintiff and Russo estimated the time of the coach's absence as about 20 minutes. The coach, a certified foreign language teacher, had coached during the previous school year. At the time he was hired to coach, the assistant athletic director gave him some printed materials and he met with the school's athletic director. He had, before 1988, supervised athletic activities involving younger students in two prior positions, serving for four years as athletic director at one school.

No specific license or other designation was required for supervisors of after-school athletic activities. Nor did the Board have specified rules and regulations for coaches or for the supervision of such activities. The proper supervision at athletic events and practice is, of course, included within the responsibilities of a public high school athletic coach, who is required to complete two coaching courses within three years of becoming a coach. Plaintiff's volleyball coach had completed the first aid course required of all high school coaches. He was compensated for a maximum of 32 hours per month of after-school volleyball coaching, including two-hour practice and four-hour game sessions.

The coach had warned the new team members, including plaintiff, not to play around in the gym and to observe safety rules. He told them "not [to] do anything else, just play volleyball, and that's all." It was his custom to have four members of the team, with the captains in charge, set up the equipment at every practice session. He had never instructed the players in any way with regard to jumping or diving over the net and had never observed a player attempt such a feat. He testified that he did not have disciplinary problems with the team and never saw them roughhousing. The only injury to a team member that he could recall was a pulled muscle during a spring 1987 game.

The school's assistant athletic director had given the new coaches, including the coach involved here, handouts, one of which, entitled "A 23-Point Defensive Game Plan for Lawsuit-Conscious Athletic Directors/Coaches", included a list of the varying situations that might cause accidents. In the assistant athletic director's view, the standard of supervision for coaches was the same as that of a teacher. In his words, a coach should be present "at the activity" and "never leave a class unattended." Plaintiff presented an expert in "physical education supervision", who testified that leaving high school athletes

unsupervised in their activities for 5 to 15 minutes was unacceptable and unreasonable. The Board's motion to dismiss for failure to make out a prima facie case, made at the conclusion of plaintiff's case, was denied.

A unanimous verdict of liability was returned, the jury apportioning fault, as noted, against the Board and plaintiff. A second jury was empaneled and, after hearing testimony on damages, awarded plaintiff $18,834,000 which, after offsets for plaintiff's 20% fault and the receipt of disability payments, was reduced to $14,904,145. Since the Board did not owe plaintiff a duty to provide supervision during the prepractice setting up of equipment and, in any event, plaintiff assumed the known and obvious risks of his own voluntary actions, we reverse the judgment and dismiss the complaint.

"Schools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision". (*Mirand v City of New York*, 84 NY2d 44, 49.) In assuming physical custody and charge of the student the Board stands in the place of the parents or guardian. (*Supra.*) The standard is not the same, however, in the case of school-sponsored extracurricular athletic activities. "In the context of wholly voluntary participation in intramural, interscholastic and other school-sponsored extracurricular athletic endeavors, we have required the exercise of the less demanding ordinary reasonable care standard" (*Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 656), defined as "ordinary reasonable care to protect student athletes * * * from unassumed, concealed or unreasonably increased risks" (*supra*, at 658). By implication, school boards are not required to protect student athletes from the risks inherent in the sport or the activity in which they are engaged. Nor does reasonable care impose upon a school board the obligation of assuring the safety of a student during after-school athletic activities against the consequences of his own independent and ill-advised acts unrelated to the sport in which he is engaged.

In this regard, plaintiff has failed to prove that he was faced with a risk that was unassumed, concealed or increased. The evidence shows that plaintiff himself created the peril and, aware of the danger, assumed the risks of his conduct. There was no evidence that the Board was on notice of the likelihood of any harm or that it could have foreseen that plaintiff would place himself in danger. Plaintiff himself testified that he had never attempted to dive over a net in any high school gym

class and conceded that he never observed anyone else attempt to dive over a volleyball net.

Until this incident, there had never been any adverse consequences as a result of the coach's custom, before the start of practice, to leave the team members in the gym unattended with the understanding that they were to set up the volleyball net for the practice session. Leaving 17- and 18-year-old athletes unattended in such circumstances with the instruction to behave appropriately does not constitute an unassumed, concealed or unreasonably increased risk of harm from a sporting activity. While playing volleyball might itself involve an increased risk of injury through player contact, falls on the floor or even fighting, as the coach knew when he temporarily left the players unsupervised, there was no unreasonably increased risk during the period preceding the practice. Nor could plaintiff's action reasonably have been anticipated. "[I]f defendant's conduct was reasonable in light of what could have been anticipated, there is no breach of duty, no negligence and no liability." (*Gordon v City of New York*, 70 NY2d 839, 841.)

Thus, plaintiff is compelled to argue that the Board had the duty to supervise him and his teammates at all times during the extracurricular team practice session, including during the setting up of the net. Unfortunately for plaintiff, that is not the standard. As *Benitez v New York City Bd. of Educ.* (*supra,* 73 NY2d, at 657-658) holds, a school board's duty of student supervision is not the same for voluntary after-school extracurricular athletic activities as it is for regularly scheduled school-day classes. The rationale behind the distinction is plain. A higher degree of vigilance is required whenever the student is required to attend or engage in a certain activity. On the other hand, when the activity is voluntary and extracurricular, and especially of an athletic nature, the normal risks of the activity are accepted and, therefore, a duty is imposed upon the Board only if the risks with respect thereto are unreasonably increased, concealed or are of an unassumed nature. It should be noted, however, that even in the case of regular school-day activities, constant supervision of high school students is not legally required (*see, Garcia v City of New York*, 222 AD2d 192, 196).

In the absence of prior incidents putting the Board on notice, the assemblage in a high school gym of a group of about seven or eight high school athletes, members of the volleyball team, who had been instructed to set up a volleyball net, would not trigger a duty of constant supervision. Neither the testimony

of plaintiff's expert that young athletes should never be left alone nor the assistant athletic director's testimony of a similar vein established the applicable standard of care. (*See, Sherman v Robinson*, 80 NY2d 483, 489, n 3; *Pascarella v City of New York*, 146 AD2d 61, 70, *lv denied* 74 NY2d 610.) Significantly, no Board regulation or formal policy statement specifically requiring a coach to remain with his team at all times was offered in evidence. As for the guidelines in the "23-Point Defensive Game Plan", they are clearly aspirational, not mandatory.

Nor did the presence of athletic equipment in the gym impose upon the Board a duty to supervise plaintiff and the other team members at all times. Neither a volleyball net nor a gym mat is inherently dangerous. In the absence of prior incidents involving improper use, the fact that these items could be used for a purpose other than their intended use did not render their availability foreseeably dangerous. (*Compare, Govel v Board of Educ.*, 267 App Div 621, 624-625, *affd* 293 NY 928 [verdict based on failure to supervise pupil with respect to gun repair reinstated].) The coach had not had prior disciplinary problems with the team. The insignificant, yet forbidden, "fooling around" that had occurred in his absence on earlier occasions did not pose a substantial risk of physical harm to the team members or portend that much more dangerous activity such as that which was engaged in here was likely to occur. (*See, Lawes v Board of Educ.*, 16 NY2d 302; *compare, Alferoff v Casagrande*, 122 AD2d 183 [teacher aware of students' rowdy and disruptive behavior that regularly took place in his absence].) Thus, the record fails to show that the coach was on notice of such dangerous prior activity by the team members such that his constant supervision was required.

Moreover, as the trial evidence discloses, in attempting to dive over the volleyball net, plaintiff was fully aware of the risk he was undertaking and thus assumed that risk. He had seen Russo attempt a jump and decide against it. He had recognized the necessity of using a mat to soften the impact of his landing after the jump. As a youngster participating in karate classes, he had been warned of the potential for injury involved in such activity. His teammates, including Cruz, one of the team captains, told him that he should not attempt the jump. Moreover, he attempted the jump without the coach's consent and contrary to the latter's directions to set up the net and warning not to "horse" around. Furthermore, plaintiff had signed a form expressly waiving claims against the Board for

injury incurred "during participation in any phase of the athletic program." Such broad language cannot be read in any way other than as including the prepractice activity of setting up the volleyball net.

The unauthorized nature of plaintiff's dive over the net bears significant similarity to the dive from a public pier in *Heard v City of New York* (82 NY2d 66), held by the Court to be an assumed risk. After initially instructing the 17-year-old plaintiff not to dive, the lifeguard in *Heard* reluctantly permitted one more dive, which resulted in serious injury. The Court held that the City's duty to supervise recreational activities did not extend to "protecting patrons from 'the dangers inherent in the sport so far as they are obvious and necessary'." (*Supra,* at 71, quoting *Curcio v City of New York*, 275 NY 20, 23-24.) As in *Heard*, plaintiff, in attempting to dive over the volleyball net, knowing that he should not, accepted the obvious risks of that activity, and the Board did not owe him a duty with respect to the foreseeable injury that he might incur in attempting such a feat.

In light of our determination that plaintiff failed to prove the Board's negligence, we need not reach the other issues it raises.

Accordingly, the revised judgment of the Supreme Court, New York County (Lorraine Miller, J.), entered April 25, 1995, which, following a jury verdict finding plaintiff 20% and the Board 80% responsible for plaintiff's injuries, awarded him damages with a present value of $10,982,616, should be reversed, on the law, without costs or disbursements, and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint.

ELLERIN, MAZZARELLI and ANDRIAS, JJ., concur.

Revised judgment, Supreme Court, New York County, entered April 25, 1995, reversed, on the law, without costs or disbursements, and the complaint dismissed.