[743 NYS2d 456]

CARLOS MARCANO, Appellant, v CITY OF NEW YORK, et al., Respondents.

First Department, June 11, 2002

**APPEARANCES OF COUNSEL**

*David L. Kremen* of counsel (*Oshman, Helfenstein, Bernstein, Mirisola & Schwartz, LLP,* attorneys), for appellant.

*Cheryl Payer* of counsel (*Stephen J. McGrath* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondents.

### OPINION OF THE COURT

BUCKLEY, J.

The issue here is, are there questions of fact concerning whether plaintiff assumed the risk of his injury? We answer in the affirmative, reinstate the complaint, and remand for further proceedings.

### I.

This is an action for damages for serious personal injuries sustained by plaintiff Carlos Marcano while he was being detained on $2,500 bail at Rikers Island. There are no charges presently pending against plaintiff, and he has never been convicted of a crime. In 1988, plaintiff came to the United States from the Dominican Republic.

Certain facts are undisputed. On June 25, 1995 at approximately 1:10 P.M., plaintiff, age 34, was injured in the outdoor recreation yard of the West Facility on Rikers Island. Plaintiff fell from a set of metal, parallel exercise bars in the yard, striking his head on the cement beneath the bars and thereby becoming quadriplegic. Plaintiff had not seen or used these exercise bars before the time of this injury. Although plaintiff had seen metal exercise bars in parks, he had never seen exercise bars exactly like the ones from which he fell. Prior to plaintiff's injury: (1) he had never used any parallel bars or dip bars; (2) no one had ever instructed him as to how such apparatus should be used; (3) no one had ever told him what exercises the bars were intended for; (4) he did not know what exercises the apparatus was designed for; and (5) he had never seen anyone use this apparatus. Plaintiff was never a member of a gym or an exercise club. Plaintiff had no exercise equipment in his home except dumbbells. Plaintiff's only exercise was running in the parks and on the streets.

Plaintiff was totally unfamiliar with the use of this equipment. He had no experience or other basis for knowing: (1) that the parallel bars were too thick; (2) that the bars should not have been square; and (3) that the concrete under the parallel-dip bars, without absorbent padding, created a grave danger. There is no evidence that plaintiff in fact understood that the dimensions of these parallel bars were nonstandard and prevented him from maintaining a grip when

swinging. There is, moreover, evidence of an enhanced risk created by the unique circumstances of the manufacture of these parallel bars by defendants.

In his examination before trial, eyewitness Angel Hernandez, who is unacquainted with plaintiff, testified that he saw plaintiff take two quick steps, grasp the bars and jump up on them. As he watched, Hernandez observed that while plaintiff still held onto the bars, his momentum carried his legs forward over his head. Then as plaintiff's legs went backward and up, Hernandez saw his arms give out, and saw him lose his grip on the bars and fall face down on the concrete beneath, hitting first his head and then his body.[1] Hernandez had exercised on these same bars and testified that these bars are thicker than normal parallel or dip bars. He testified that there were no signs or instructions on how to use the exercise bars and that there was no matting or anything else to cushion the concrete beneath the exercise bars.

The then-Supervisor of Mechanics of Rikers Island and his welder, who together designed and built the metal exercise bars, agree that it was built economically from metal on hand, which was also used to build doors, partitions, window frames, and cages for air conditioning units. The dip bars were made of two by two square tubing, two inches square on each side for a total circumference of eight inches. The attached chin bar, however, was round rather than square, and was made of narrower tubing than the square tubing. In the construction of these bars, the designer and builder used no industry standards and sought no advice from engineers, other designers, manufacturers, purveyors, health clubs or gymnasts.

Plaintiff's expert, Richard Nelson, Ph.D., a professor of biomechanics, the Founding Director of the Biomechanics Laboratory at Penn State University and a member of the Medical Commission of the International Olympic Committee, inspected the exercise bars and describes them as follows:

> "a metal exercise apparatus with what appeared to be a chinning bar which was approximately 7 ft 8 inches from the ground. On either side of the chinning bar were metal bars 3 ft 8 inches in length, which were connected to and perpendicular to two

---

1.  Thus Hernandez describes a split-second event, with *one* backward motion, interrupted by plaintiff's precipitous plunge to the rock-like concrete. This is *not* a free-wheeling, extended, acrobatic, performance with repetitious swinging back and forth, as suggested by the dissent.

sets of parallel or dip bars. Each set of dip or parallel bars were 4 feet 2 inches long and 4 ft in height off the ground. Beneath the apparatus was a cement surface, not covered by any absorbent padding. No signs were posted indicating the purpose of the apparatus or how it was to be used."

Dr. Nelson, in his affidavit, contends that the parallel bars have two defects which "unreasonably increased the risk of injury." The first defect is that the squareness of the metal bars makes them difficult to grip, a design defect. The second defect is that the eight-inch grip circumference of the dip bars is larger than the industry standard which ranges from $3^7/8$ inches to $7^1/8$ inches, with the usual between four to six inches in circumference.[2]

Dr. Nelson considers that plaintiff had never used this particular kind of exercise bars, had never used any dip bars of any kind, and had never seen exercise bars with a design identical to the bars at issue until the moment plaintiff used them, because this apparatus was of a unique design.

Furthermore, Dr. Nelson holds that defendant has defectively designed the exercise bars by constructing dip bars which are open at both ends as parallel bars are, whereas, dip bars designed by companies in the industry are closed on one end which makes it difficult if not impossible for the user to swing his or her legs back and forth.

Finally Dr. Nelson contends that the defendant created a uniquely dangerous condition by placing the bars over concrete rather than some absorbent material, and by failing to either warn or instruct or supervise plaintiff in the use and danger of the exercise bars.

Defendant offered no expert opinion to dispute the opinions of plaintiff's expert.

The IAS court granted defendants' motion for summary judgment on the grounds that (1) any defects were open and obvious and (2) plaintiff had assumed the risk of falling when he engaged in exercise activity. While we agree that the square shape of these exercise bars was obvious, whether any

2. Dr. Nelson's deposition testimony is admissible as evidence of custom and usage in the industry and as to the industry standard. (*Lugo v LJN Toys*, 75 NY2d 850, 852; *Cramer v Kuhns*, 213 AD2d 131,137, *lv dismissed* 87 NY2d 860; *Cruz v New York City Tr. Auth.*, 136 AD2d 196, 199; *Portilla v Rodriguez*, 179 AD2d 631; *Bellinzoni v Seland*, 128 AD2d 580, 581; Prince, Richardson on Evidence § 7-307 [Farrell 11th ed]; Fisch, New York Evidence § 418 [2d ed].)

enhanced risk was created as a result of defendants' negligence remains a disputed issue of fact. The record evidence shows that the City gave no consideration to the width to be used for the bars, that the width used is wider than the industry standard and that, according to uncontroverted expert testimony, plaintiff could not have maintained a proper grip with such width (*see, Morgan v State of New York*, 90 NY2d 471, 484-486). The record does not reveal that plaintiff possessed any familiarity with the risks posed by varying the shape or dimension of the bar (*see, Turcotte v Fell*, 68 NY2d 432, 437; *Maddox v City of New York*, 66 NY2d 270, 278-279; *Bereswill v National Basketball Assn.*, 279 AD2d 292). This is not a case where the risk was demonstrated by prior contemporaneous incidents (*Sajkowski v Young Men's Christian Assn.*, 269 AD2d 105). A participant in recreational activity will not be deemed to have assumed unreasonably increased risks (*see, Mauner v Feinstein*, 213 AD2d 383; *Lamey v Foley*, 188 AD2d 157, 164-165).

## II.

Defendant contends that, as a matter of law, plaintiff has assumed the risk of his injury, thus barring his recovery. We must take care to distinguish between two distinct doctrines of assumption of risk. The first doctrine is found in the concept of "culpable conduct attributable to the claimant" (CPLR 1411). As with comparative negligence, this doctrine of assumption of risk does not bar recovery, but diminishes recovery in the proportion to which the claimant contributed to his injuries. Here we are concerned, however, with the second doctrine of assumption of risk, known as primary assumption of risk (*see, Turcotte v Fell*, 68 NY2d 432, 438). By electing to participate, the plaintiff is deemed to have consented "to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation." (*Turcotte* at 439.) This doctrine is invoked in connection with voluntary participation in competitive athletics—professional, amateur, interscholastic, and even informal exercise athletics as in this case. "The policy underlying this tort rule is intended to facilitate free and vigorous participation in athletic activities." (*Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 657.) The doctrine of assumption of risk is not a measure of the plaintiff's comparative fault, but a measure of the defendant's duty of care. Primary assumption of risk eliminates the tortfeasor's duty of care and can be a complete bar to recovery (*Turcotte v Fell, supra* at 438-439; *Maddox v City of New York*, 66 NY2d

270, 276; *see* Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1411:1, C1411:2). As such, the focus of inquiry turns to the injured party's awareness and appreciation of anticipated risks:

> "The applicability of the doctrine depends on the nature and scope of the participant's awareness and consent * * *. Whether it can be concluded that a plaintiff made an informed estimate of the risks involved in an activity before deciding to participate depends on the openness and obviousness of the risk, plaintiff's background, skill, and experience, plaintiff's own conduct under the circumstances, and the nature of defendant's conduct * * *. Perhaps the most important factor * * * is whether the risk is inherent in the activity * * *. A plaintiff will not be held to have assumed those risks that are not inherent * * * i.e., not 'ordinary and necessary' in the sport * * *. Generally, the issue of assumption of risk is a question of fact for the jury." (*Lamey v Foley*, 188 AD2d 157, 163-164.)

In *Cole v New York Racing Assn.* (24 AD2d 993, 994, *affd* 17 NY2d 761) during the course of an "exhibition" workout between races, a professional jockey, Sidney Cole, was thrown from his mount after it collided with an infield track rail, installed in 1959. In falling, Cole hit his head on a concrete footing which rose from three to five inches above ground level. Research showed that no other track in the country had footings elevated in this manner; and the original design of the track called for footings to be level with the ground as a safety precaution. The change in design to raise the footings was made for economy, in order to retard corrosion of the metal posts. In affirming the verdict for the plaintiff, the Court held that the defendant's deviation from the general custom for reasons of economy was negligence and that the owner's

> "claim that decedent's assumption of the risks inherent in racing embraced the danger occasioned by the elevated condition of the footings was not supported by any evidence tending to show that the danger was 'ordinary and necessary' to the sport and thus inherent in the activity itself * * *."
> (*Cole v New York Racing Assn., supra* at 994.)

The Court of Appeals approvingly cited *Cole* in *Turcotte v Fell* (*supra*), finding implied consent irrelevant when a specific risk is not inherent to a sport since,

"[T]he decedent in *Cole* could not have consented to the danger created by the footings because the danger of them did not 'inhere' in the sport. Thus, the track proprietor was not entitled to the absolute defense of assumption of risk and its conduct in maintaining the premises was measured by a general negligence standard." (*Turcotte v Fell, supra* at 444.)

Assumption of risk and implied consent require knowledge and appreciation; such determinations are fact dependent since,

"There is no question that the doctrine requires not only knowledge of the injury-causing defect but also appreciation of the resultant risk * * *, but awareness of risk is not to be determined in a vacuum. It is, rather, to be assessed against the background of the skill and experience of the particular plaintiff." (*Maddox v City of New York, supra* at 278.)

In *Owen v R.J.S. Safety Equip.* (79 NY2d 967), the plaintiff's husband died when the race car he was driving went out of control and struck a perimeter race track wall. On the defendant's motion for summary judgment, the plaintiff submitted expert affidavits to the effect that the contour of the track's retaining wall, as well as the design of its guardrail and the placement of barrels near the guardrail, is unique and creates a dangerous condition over and above the usual dangers inherent in the sport of auto racing. The plaintiff's decedent may have been an experienced race car driver who assumed the risks of injury in auto racing. The plaintiff's affidavits, however, were sufficient to create a triable question of fact as to whether the defendant's alleged negligence increased risk in the sport; and, if true, whether the decedent should be deemed to have assumed that risk by voluntarily racing.

In *Lamey v Foley* (*supra*), the plaintiff was left paraplegic after an all-terrain vehicle (ATV) accident which occurred as he performed a promotional stunt at the request of a television crew. The accident occurred at a race track where a competition was to take place involving plaintiff and other professional ATV riders. As a result of his injuries, the plaintiff commenced an action against the designer, manufacturer and marketer of the ATV and the competition's promoters who had designed the track. The defendants asserted that as a matter of law, the plaintiff assumed the risk of his injuries, thus negating any duty on the part of the defendants.

The plaintiff in *Lamey* was ranked among the top professional riders in the country. There is no question that he generally understood the hazards of racing three-wheel ATV's, which are inherently unstable because of their three-wheel design and lack of a rear differential, in narrow confines at high speeds, close to other, sometimes inexperienced, racers.

On the morning of the accident, hay bales were placed in front of the fence, not vertically against the fence, but flat on the track. For the simulated race, a camera was set up within the hay bales in front of the fence in the "high speed corner" adjacent to the straightaway. The plaintiff was asked to ride "high" in the corner and throw dirt at the camera, and agreed to accommodate the camera crew. Racers left the starting line and approached the corner. The plaintiff's speed took him too high in the corner. His right wheel hit one of the hay bales, causing his ATV to flip. The plaintiff was thrown over the bales and into an unprotected fence post. The impact severed his spinal cord.

The defendants moved for summary judgment and sustained their initial burden on the motion, showing that the fence surrounding the track was an open and obvious hazard and that the plaintiff had willingly participated in the stunt race, with a general appreciation of the risk of his being thrown from the ATV and injured. In opposition to the motion, the plaintiff submitted the deposition testimony of an expert on the setting up of ATV race tracks. The expert testified that the hazard created by the defendants, the unpadded fence post on the outside of a high speed turn, was not ordinary or necessary in the sport, but was contrary to the way tracks are generally designed. Also, the plaintiff produced medical proof that the unpadded fence unreasonably increased the risk of injury and, in fact, caused his injury. Based upon this proof, the Appellate Division concluded that there existed a triable question of fact whether the plaintiff assumed the risk of his injuries and held "it is inferable that the placement of the hay bales on the surface of the track, where they could interfere with riders, constituted an unreasonably enhanced risk not inherent in the sport." (*Lamey v Foley, supra* at 165.)

Thereafter, the Court of Appeals in *Morgan v State of New York* (90 NY2d 471) restated the basic principles which determine the boundary between assumption of risk based on implied consent and triable issues of fact resulting from unreasonably increased risks that:

"participants will not be deemed to have assumed

* * * unreasonably increased risks * * *. Therefore, in assessing whether a defendant has violated a duty of care within the genre of tort-sports activities and their inherent risks, the applicable standard should include whether the conditions caused by the defendants' negligence are 'unique and created a dangerous condition over and above the usual dangers that are inherent in the sport' * * *

"[T]he application of the assumption of risk doctrine in assessing the duty of care owed by an owner or operator of a sporting facility requires that the participant have 'not only knowledge of the injury-causing defect but also appreciation of the resultant risk, but awareness of risk is not to be determined in a vacuum. It is, rather, to be assessed against the background of the skill and experience of the particular plaintiff.' " (*Morgan v State of New York, supra* at 485-486.)

Applying these principles to the four cases at hand in *Morgan*, the Court of Appeals determined:

1. In *Morgan*, the plaintiff was thoroughly familiar with the bobsled course; there was no evidence that the opening in the wall in the course finish-run added to or heightened risk beyond that inherent in this dangerous sport. Nor was there any evidence that the opening was the result of any defect in the design of the bobsled course itself. The bobsledder's claim was properly dismissed on assumption of risk grounds.

2. In *Beck*, the plaintiff asserted that the defendants were negligent in supervising the martial arts class during which plaintiff was injured while attempting to vault or "jump roll" over an obstacle, an activity which he had performed numerous times before. When tumbling as he had been trained during his 15 month attendance at the school, the plaintiff assumed the risk of landing correctly. Summary judgment in favor of the defendant was affirmed.

3. In *Chimerine*, the plaintiff claimed that at the time of her accident, she did not understand the risks inherent in martial arts training because she had taken only three previous classes. The instructor directed that she "step, hop, skip, jump, kick, land." A reasonable person of her age and experience would be expected to know that there is a risk of loss of balance and subsequent injury when stepping, hopping, skipping, jumping, kicking and landing. The grant of summary judgment dismissing the complaint was affirmed.

4. In *Siegel*, the plaintiffs asserted that the torn net separating the tennis courts was not "inherent" in the sport and therefore a player should not be deemed to have assumed the risk of such a tripping accident during a tennis match. The Court of Appeals held (at 488) "We agree with Siegel's argument that because a torn net is not an 'inherent'. part of the game of tennis in and of itself, he should not be deemed legally to have assumed the risk of injuries caused by his tripping over it." Accordingly, the Court reversed and denied the defendant's motion for summary judgment.

## III.

Although "[s]chools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision" (*Mirand v City of New York*, 84 NY2d 44, 49), the standard is relaxed in the case of school-sponsored extracurricular activities. "In the context of wholly voluntary participation in intramural, interscholastic and other school-sponsored extracurricular athletic endeavors, we have required the exercise of the less demanding ordinary reasonable care standard" (*Benitez v New York City Bd. of Educ.*, 73 NY2d at 656). This is defined as "ordinary reasonable care to protect student athletes * * * from unassumed, concealed or unreasonably increased risks." (*Id.* at 658.)

In applying this standard, we have concluded that a plaintiff, in attempting to dive over the volleyball net, was fully aware of the risk he was undertaking and assumed the risk, since

"[h]e had seen Russo attempt a jump and decide against it. He had recognized the necessity of using a mat to soften the impact of his landing after the jump. As a youngster participating in karate classes, he had been warned of the potential for injury involved in such activity. His teammates, including Cruz, one of the team captains, told him that he should not attempt the jump." (*Barretto v City of New York*, 229 AD2d 214, 220, lv denied 90 NY2d 805.)

A case with a similar fact pattern is *Ascher v Scarsdale School Dist.* (267 AD2d 339), where the Court, affirming summary judgment dismissing the complaint, decided that "[t]he infant plaintiff's sudden, unforeseeable, unsuccessful attempt to perform a so-called 'back flip' dismount from a moving playground swing while his teacher's back was turned was the sole proximate cause of his injuries." (*Id.*)

The record in that case discloses that the plaintiff, age 11, admitted that he had not performed other backflips during this class or during prior gym classes; and before the accident, he did not remember ever doing backflips when the teacher was present. While the plaintiff indicated that other fifth grade students had backflipped before, the plaintiff could not name any such student. Moreover, the plaintiff testified that the teacher had not seen the backflips done by other students. In fact, the teacher observed the swing area for 30 seconds to a minute before becoming aware of the accident.

The *Ascher* Court cited *Barretto*, but correctly applied *Mirand*'s more stringent standard of "adequate supervision" and found that the plaintiff's injuries in *Ascher* were not proximately related to the absence of adequate supervision. In the case at bar, on the other hand, a question of fact exists as to whether there was adequate supervision or instruction before plaintiff tried to use the parallel-dip bars.

A review of exercise and sport cases demonstrates that the boundary between assumed risks and nonassumed enhanced risks is clear and that plaintiff in this case may well have confronted enhanced risks which he had not assumed.

In *Simoneau v State of New York* (248 AD2d 865), the claimant, a skier at a State-run skiing facility, was struck by a chair lift and fell on a two-by-four wooden board which delineated the edge of a ramp that guided skiers toward the lift-boarding area. Claimant, a skier for 20 years, had ridden the chair lift several times that day. At trial, her expert did not demonstrate that the State's use of these wooden boards departed from the general standard or custom in the industry. The Court, in affirming dismissal, wrote:

> "the critical inquiry is whether th[e] condition is 'unique', constituting a hazard 'over and above the usual dangers that are inherent in the sport' * * *. While recovery may still be had for damages resulting from exposure to 'unreasonably increased risks' * * * here, the risk is open and obvious to the participant, taking into consideration his or her level of experience and expertise * * *." (*Id.* at 866-867.)

In the instant case, however, a question of fact exists as to whether the specially constructed parallel-dip bars were "unique," exposing plaintiff to "unreasonably increased risks" not open and obvious to plaintiff, taking into consideration his level of experience and expertise.

In *Liriano v Hobart Corp.* (92 NY2d 232), the plaintiff, an employee in the meat department of a grocery store, was feeding meat into a commercial meat grinder from which the safety guard had been removed. The plaintiff's hand was caught in the "worm" that grinds the meat. As a result, his right hand and lower forearm were amputated.

> "[T]he open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not *reasonably apparent* to the user.
>
> [T]he open and obvious danger exception is difficult to administer * * *. The fact-specific nature of the inquiry into whether a particular risk is obvious renders bright-line pronouncements difficult, and in close cases it is easy to disagree about whether a particular risk is obvious. It is hard to set a standard for obviousness that is neither under- nor over-inclusive. Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question * * *." (*Id.* at 242 [emphasis added].)

In *Liriano*, as in the case at bar, the fact-specific nature of whether the hazard was reasonably apparent to plaintiff is a jury question.

The IAS court here noted that the instant case "bears similarities to" *Green v City of New York* (263 AD2d 385). In *Green*, the plaintiff allegedly tripped over some ridges on the floor of an indoor court during a basketball game. At the General Municipal Law § 50-h hearing in the record, the plaintiff testified that he had played on that court approximately "eight to ten times" and that he had noticed the ridges "maybe about a week before the incident happened." The plaintiff "noticed that something's wrong with the corner of the gym * * * maybe about a week before the accident * * * the floor had ridges on it * * * when you enter * * * it would be the far right-hand corner of the gym." When asked if he notified anyone of the ridges, plaintiff answered "[n]o, I didn't, but it was common knowledge, I figured." When asked to explain what happened on the day of the accident, the plaintiff testified, "[W]ell I was playing basketball and I went to the little corner where the ridges was and while dribbling the ball I tripped on one of the ridges." And, plaintiff, in his notice of claim, described the defect as "on the floor of said basketball court, to wit, two or

three bumps on said floor, which bumps were approximately two inches high and located on the far right-hand corner as one enters the room where the court was located."

In *Green*, we found that no question of fact exists because the "faulty condition was perfectly obvious" (*id.* at 385), as it was in *McKey v City of New York* (234 AD2d 114 [a six-inch hole in the surface of an outside basketball court, clearly visible under the basket]). Plaintiff in this case, on the other hand, has submitted evidence demonstrating there is a question of fact as to whether the dangers of the parallel-dip bars were reasonably apparent to plaintiff. Defendants concede that the equipment was specially constructed, without reference to any standards. Whether manufacture under these circumstances subjected plaintiff to an enhanced risk cannot be resolved as a matter of law.

In *Sajkowski v Young Men's Christian Assn. of Greater N.Y.* (269 AD2d 105), the plaintiff, attending a weekend program, "Wellness for Life," stood in line with other participants and waited her turn to swing on the rope. While she was waiting, she observed that several participants lost their grip and fell. When her turn came, she grasped the rope and began to swing. At the midway point of her swing, she lost her grip and fell, injuring her ankle. No claim was made that the rope broke or was defective. In affirming summary judgment, we noted that plaintiff fully comprehended the risk since she had seen several participants fall moments earlier. In the instant case, however, a question of fact exists as to whether plaintiff had opportunity to observe users on the parallel-dip bars and comprehend the risk before he tried to use the bars.

In *Bereswill v National Basketball Assn.* (279 AD2d 292), the plaintiff, an award-winning photographer for Newsday for more than 25 years, was taking photos at his usual spot near one of the corners of the basketball court at Madison Square Garden. It happened during a 1994 final playoff game between the New York Knickerbockers and the Houston Rockets. He was hit and injured by the then New York Knick, Charles Oakley, as Oakley dove out of bounds in pursuit of a loose ball.

We affirmed summary judgment in favor of defendant because,

> "in light of plaintiff's experience and conduct, * * * any increased risks were obvious to him, and * * * he fully comprehended the circumstances and willingly assumed the risk of continuing to [work] from

the courtside spot in which the complained of collision eventually took place." (*Id.* at 294.)

It is a question of fact, however, as to whether plaintiff in the instant case had any prior experience with the parallel-dip bars and did comprehend the risk.

In *Garcia v New York City Indus. Dev. Agency* (279 AD2d 328), according to the record, plaintiff David Garcia, a truck driver, backed his 45-foot tractor-trailer into a building to make a delivery. The plaintiff asked one of the employees of York Display for a metal plate to cover the five-foot gap between his truck and the receiving area. The plaintiff proceeded to the rear of the trailer and climbed in. Then, while facing inside the trailer the plaintiff reached, grabbed a carton and tried to pull it back. He lost his grip on the carton and fell into the gap between the "trailer and the building because there was no plate." Plaintiff landed on the sidewalk. "Plaintiff's claim in his affidavit in opposition that the danger was obscured by an optical illusion is an issue raised there for the first time, and is inconsistent with his deposition testimony * * * and also without any expert or other support." Based upon this record, we affirmed the IAS court's grant of summary judgment dismissing the complaint.

In *Garcia*, the five-foot gap between the trailer and the receiving doors was open and obvious to the plaintiff, clearly a dangerous condition. In the instant case, however, it is a question of fact whether the "unique" parallel-dip bar created a dangerous condition, over and above its inherent danger, which was not obvious to plaintiff's inexperienced eye.

Applying these principles to the case at hand, and viewing the evidence in a light most favorable to the plaintiff, we determine that questions of fact exist concerning whether plaintiff assumed the risk of his injury.

Accordingly, the order of the Supreme Court, Bronx County (Stanley Green, J.), entered February 28, 2000, which granted defendants' motion for summary judgment dismissing the complaint in this personal injury action, should be reversed, on the law, without costs, the motion denied and the complaint reinstated.

FRIEDMAN, J. (dissenting). Plaintiff was injured when he fell from a set of exercise bars in the recreation yard of Rikers Island Correctional Facility. Plaintiff had been swinging himself back and forth on the bars with such force that his feet

rose to a level above his head, causing him to lose his grip on the bars in question and fall head-first on the unpadded cement floor below. Because I cannot see either how plaintiff could have been unaware of the danger that just such a calamity would result from this conduct, or how the risk was enhanced beyond the level that should have been obvious to him, I respectfully dissent from the majority's reversal of the order granting defendants summary judgment.

The subject bars, designed to be used in the performance of the exercise known as "dips," were approximately four feet off the cement floor of the recreation yard. As plaintiff's brief indicates, to perform dips one holds the bars, lowers the body by bending the arms at the elbows, and then raises the body by straightening the arms until they are fully extended. One's legs dangle directly below the upper torso during the exercise, with the feet only a short distance above the ground. The exercise does not involve swinging the body back and forth, only moving the body straight up and down in a controlled manner.

At the time of the accident that is the subject of this action, plaintiff was not performing dips. Rather, plaintiff grasped the dip bars and began swinging back and forth so forcefully that he propelled his legs not only above the level of the bars but above his head as well. It was when his legs were going backward and above his head that he lost his grip and fell face first onto the cement ground. This action against the City of New York and its Department of Correction ensued.

In opposing defendants' motion for summary judgment, plaintiff submitted the affidavit of an expert, Richard Nelson, who asserted that there were two concealed defects in the bars that contributed to plaintiff's accident. First, according to Nelson, it was a defect that the bars were square, rather than round, in shape, because the square shape allegedly "prevents a complete closure of the hand and fingers which is required for maximum grip force." This purported defect was allegedly concealed because the bars had turned dark brown as a result of rust—a condition, it was alleged, that would preclude one from recognizing the shape of the bars, i.e., that the bars were square and not round.

Second, Nelson alleged that the circumference of the bars (eight inches) was approximately seven-eighths-inch greater

than the broadest commercially manufactured dip bars.[1] According to Nelson, this constituted a design defect because, "as a result of the grip circumference and square shape of the bars at issue, [plaintiff] was unable to attain and/or maintain a secure grip on the exercise bars *at the time he fell* from the subject apparatus" (emphasis added). Nelson asserted that this purported defect was concealed because "it would be impossible, absent using a ruler or measuring tape, for [plaintiff] to have known that the grip circumference of these bars [was eight inches]."

Plaintiff's expert further opined that the bars were also rendered defective by the fact that, unlike commercially manufactured dip bars, they were open on both ends and therefore "bore a close resemblance to parallel bars," on which a person might swing. The expert also deemed defective the lack of shock-absorbent padding on the cement floor beneath the bars.

Supreme Court dismissed plaintiff's complaint on the ground that the shape and circumference of the bars were readily apparent to anyone using them. Although the majority concedes that Supreme Court was correct in holding that the square shape of the bars was obvious and, therefore, not actionable, the majority nonetheless reverses and reinstates the complaint on the ground that the circumstance that the circumference of the bars was seven-eighths-inch greater than that of the broadest commercially manufactured dip bars may have contributed to plaintiff's failure to maintain his grip on the bars while he was swinging his body back and forth, apparently with wild abandon. I cannot join in this conclusion because, as a matter of law, plaintiff did not incur any risks that were not perfectly open and obvious.

It is well established that a person participating in a recreational or athletic activity assumes, along with "those commonly appreciated risks which are inherent in [the activity]" (*Morgan v State of New York*, 90 NY2d 471, 484), additional risks that may arise from "any open and obvious condition of the place where [the activity] is carried on" (*Maddox v City of New York*, 66 NY2d 270, 277, quoting *Diderou v Pinecrest Dunes*, 34 AD2d 672, 673). Thus, "where the risk is open and obvious, the mere fact that a defendant could have provided safer conditions is irrelevant" (*Sajkowski v Young*

---

1. Nelson stated that the circumferences of the commercially manufactured dip bars he had examined ranged from 3⁷/₈ inches to 7¹/₈ inches.

*Men's Christian Assn. of Greater N.Y.*, 269 AD2d 105, 106, citing *Simoneau v State of New York*, 248 AD2d 865; *see also, Green v City of New York*, 263 AD2d 385). In other words, a defendant providing a place for recreation or athletics is obligated only "to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty" (*Turcotte v Fell*, 68 NY2d 432, 439 [citations omitted]). This principle requires the dismissal of plaintiff's complaint.

First, plaintiff could not reasonably have believed that the bars were intended for the gymnastic use he made of them. Plaintiff's rapid swinging back and forth, in which his feet rose to a level above his head, plainly posed a serious danger that he would lose his grip on the bars, regardless of how broad or narrow the bars were. This danger was inherent in the activity in which plaintiff was engaged, and plainly falls within the category of dangers of which any reasonable person, regardless of prior experience with the particular type of equipment involved, would have been "fully aware * * * through general knowledge, observation or common sense" (*Liriano v Hobart Corp.*, 92 NY2d 232, 241; *cf., Chimerine v World Champion John Chung Tae Kwon Do Inst.*, 90 NY2d 471, 488 [plaintiff, although a novice, as a "person of participatory age or experience must be expected to know that there is a risk of losing one's balance and of injury when hopping, skipping or jumping" in martial arts training]; *Sajkowski v Young Men's Christian Assn. of Greater N.Y.*, 269 AD2d at 106, *supra* [plaintiff assumed the risk of falling while swinging from a rope, which risk "is inherent in participation in such an activity"]). In view of the inherent and obvious risk of falling, the unpadded cement floor on which the bars were situated would have left no doubt in the mind of a reasonable person that the bars were not intended for the kind of gymnastic swinging for which plaintiff used them, regardless of the fact that the bars were open at both ends. Thus, liability cannot be predicated on the fact that the bars were not constructed so as to physically obstruct plaintiff's swinging.

It bears emphasis that what is dispositive here is not that dipping was the actual intended use of the bars, but that the activity plaintiff was performing obviously was *not* the intended use. Again, given that the bars were situated over an unpadded cement floor, no reasonable person could have believed that they were intended for the sort of amateur "gymnastics" in which plaintiff chose to engage.

To the extent the width of the bars may have somewhat increased the risk that plaintiff would lose his grip in performing such an unwise stunt, any extra increment of risk resulting from the less-snug grip would have been obvious as well to a reasonable person when he or she grasped the bars. If the circumference of the bars interfered with the user's ability to obtain a secure grip on the bars, the user would have been aware of his inability to attain such a grip immediately upon mounting the bars.[2] Further, it is the obviousness to the user of his ability or inability to grip the bars securely that is relevant here, not, as plaintiff would have it, the user's ability to divine the precise measurement of the circumference. Thus, even if it is assumed in plaintiff's favor that the bars' eight-inch circumference constituted a defect, that supposed defect would not be actionable, since any such defect in size, like the alleged defect in shape, would have been open and obvious to plaintiff when he grasped the bars.[3] Similarly, plaintiff cannot maintain this action based on the placement of the bars over an unpadded cement floor, yet another open and obvious condition (as the majority apparently recognizes).

For the foregoing reasons, the claim that the bars in question may have subjected plaintiff to some "concealed" risk is not sustainable. Apparently recognizing the weakness of this claim, the majority suggests a novel alternative theory for sustaining plaintiff's complaint. This theory is that the

---

**2.** That this supposed defect was obvious is borne out by uncontradicted record evidence. Nonparty Angel Hernandez, who witnessed plaintiff's accident, testified at his deposition that he observed that plaintiff's hands did not wrap around the bars as he grasped them prior to his fall. Hernandez further testified that, when he used the bars himself just a few minutes before plaintiff, he could not fit his own hands around them because they were "too thick."

**3.** I note that, assuming for purposes of argument only that the circumference of the bars was too large for performing dips, any such defect of the bars when put to that use would also be nonactionable by reason of its obviousness. I would further note, however, that the record provides no support whatsoever for the view that the bars at issue were defective in any way if used to perform dips. While plaintiff's expert states that the bars had a circumference seven-eighths-inch greater than the broadest commercially manufactured dip bars he had examined, plaintiff's expert did not opine that the additional seven-eighths-inch of circumference rendered the bars unreasonably dangerous for performing dips, nor did he even supply any facts that would have supported such a conclusion. Furthermore, and contrary to the majority's position, plaintiff's expert made no assertion that the eight-inch circumference violated any industry standard, or that any industry standard even existed. Indeed, the wide range of circumferences among the commercially manufactured dip bars the expert examined—from $3^7/8$ inches to $7^1/8$ inches—tends to show that there is no such industry standard.

"nonstandard" nature of the bars, which were fabricated for defendants by a welder without any particular expertise in building exercise equipment, somehow provides a potential basis for imposition of liability even if plaintiff voluntarily exposed himself to obvious dangers arising from an obviously unintended use of the bars. The majority, however, cites no authority supporting this position, which is inconsistent with the above-cited cases applying the doctrine of assumption of risk.

Plaintiff's final argument is that defendants had a duty to give him a warning or instructions spelling out the bars' intended use and advising him that the improper use of the bars could result in injury, or else to supervise inmates' activities in the exercise yard so as to avert any injuries arising from improper use of equipment. This argument, too, is unavailing. In *Barretto v City of New York* (229 AD2d 214, *lv denied* 90 NY2d 805) the plaintiff, a member of his high school's varsity volleyball team, attempted to jump head-first over a half-raised volleyball net, seeking to land on a mat on the other side, while the team was unsupervised by its coach. In the course of plaintiff's jump, his waist caught the top of the net, and he landed head-first on the ground, suffering serious injury. In finding that the Board of Education could not be held liable for this accident, this Court first stated that "a school board [does not have] the obligation of assuring the safety of a student during after-school athletic activities against the consequences of his own independent and ill-advised acts * * *" (229 AD2d at 218). We further stated that the presence of athletic equipment in a gym does not impose a duty of supervision for the following reason:

> "Neither a volleyball net nor a gym mat is inherently dangerous. In the absence of prior incidents involving improper use, the fact that these items could be used for a purpose other than their intended use did not render their availability foreseeably dangerous." (*Id.* at 220; *see also, Ascher v Scarsdale School Dist.*, 267 AD2d 339, 339 [school district not liable where infant plaintiff "attempt[ed] to perform a so-called 'back-flip' dismount from a moving playground swing while his teacher's back was turned"].)

*Barretto* and *Ascher* establish that there is generally no duty to warn users of athletic equipment against the self-evident dangers of activity obviously constituting misuse of the equip-

ment, nor is there any duty to supervise users to prevent them from engaging in such misuse. This is merely an application of the general rule that there is no duty to warn against "a danger [that] is readily apparent as a matter of common sense" (*Liriano v Hobart Corp.*, 92 NY2d at 242, *supra*). There can be no doubt that this principle applies here. Again, for reasons previously discussed, any reasonable person in plaintiff's position would have realized that the bars in question were not intended to be used in the manner plaintiff was using them. In addition, here, as in *Barretto*, there is no evidence either that defendants had any notice prior to the incident giving rise to this action that inmates had been improperly using the bars, or that any inmate prior to plaintiff ever had an accident while using these bars.

The case for application of the principle illustrated by *Barretto* and *Ascher* is even more compelling here than it was in either of those cases, as the present plaintiff was not a child, but a 34-year-old adult, when he was injured. As a matter of common sense and simple justice, the law should not afford lesser protection to a child than it does to an adult, who is obviously chargeable with greater responsibility for assuring his or her own safety.

In sum, the bars at issue had no concealed defects, and defendants had no duty to instruct or supervise plaintiff to prevent his ill-advised and unforeseeable choice to use the bars to perform a gymnastics routine for which they obviously had not been designed. The danger posed by performing gymnastics over a hard cement floor, on equipment free of any concealed defect, was inherent, open and obvious, and plaintiff should not be permitted to hold defendants responsible for his own reckless choice to court that danger. Here, as in *Barretto* (*supra*), "plaintiff himself created the peril and, aware of the danger, assumed the risks of his conduct" (229 AD2d at 218). Accordingly, I would affirm the dismissal of plaintiff's complaint.

MAZZARELLI, J.P., and ROSENBERGER, J., concur with BUCK-LEY, J.; ANDRIAS and FRIEDMAN, JJ., dissent in a separate opinion by FRIEDMAN, J.

Order, Supreme Court, Bronx County, entered February 28, 2000, reversed, on the law, without costs, defendants' motion for summary judgment dismissing the complaint in this personal injury action denied and the complaint reinstated.