Maharaj v City of New York (2025 NY Slip Op 02143)

Maharaj v City of New York

2025 NY Slip Op 02143

Decided on April 15, 2025

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 15, 2025

No. 34 

[*1]Parnand Maharaj, Appellant,
v
City of New York, et al., Respondents.

Joshua Annenberg, for appellant. 
Ingrid R. Gustafson, for respondents.

MEMORANDUM:
The order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
Plaintiff was injured while playing cricket on a tennis court in a park owned by the City of New York when he ran to catch a batted ball and stepped into a large crack in the asphalt. The Appellate Division correctly held that the risks of tripping and falling while playing on an irregular surface are inherent in the game of cricket (see Turcotte v Fell, 68 NY2d 432, 443 [1986]). There is no evidence in the record that the irregularity in the playing field—the cracked and uneven surface of the tennis court—unreasonably enhanced the ordinary risk of playing cricket on an irregular surface (see Bukowski v Clarkson Univ., 19 NY3d 353, 356 [2012]). Defendants were therefore entitled to summary judgment dismissing the complaint on the ground that the primary assumption of risk doctrine precludes liability on the part of defendants.

RIVERA, J. (dissenting):

Plaintiff Parnand Maharaj alleges that he was injured during a cricket match when he tripped over a seven-foot-long fissure, three to four inches deep, that ran across the playing surface in a public park. It is undisputed that defendants, the City of New York and the City's Parks and Recreations Department, owned and operated the park and that they let it fall into disrepair in the years leading to plaintiff's injury. The only question on appeal is whether defendants are immune from liability for this allegedly negligent condition under the Court's primary assumption of risk doctrine. The majority, without explanation, distorts that doctrine to hold that they are. The primary assumption of risk doctrine does not completely displace a landowner's traditional duty of care to maintain their premises in a safe condition. Tripping on a fissure that is allegedly the result of years of neglect is not a risk inherent to cricket, or any other sport, and defendants were therefore not entitled to summary judgment on the theory that plaintiff assumed the risk of injury by playing on a deteriorated surface. The majority empowers defendants to escape all accountability for their alleged negligence, which put plaintiff and other park users at risk of serious injury. I dissent.
I.
Plaintiff was injured playing cricket on parkland owned and operated by defendants. For those who are unfamiliar with cricket, which has become the world's second most popular sport (see Steve Douglas & Brian Church, The World's Second Most Popular Sport: An AP Guide to Cricket, Associated Press News, May 28, 2024, https://apnews.com/article/t20-cricket-world-cup-united-states-west-indies-07bc2c9a37e907654c56ca12f27c88cd [accessed Mar. 23, 2025]), some background follows. Cricket initially spread through British colonialism to India, countries in Africa, and parts of the Caribbean, among other regions (see Jason Kaufman & Orlando Patterson, Cross-National Cultural Diffusion: The Global Spread of Cricket, 70 Am. Sociological Rev. 82, 86 [2005]). It had a "significant following" in the United States beginning in the mid-nineteenth century, and the "first official international cricket match" was held between the United States and Canada in 1844, but the sport's popularity waned by the century's end (id. at 83, 86). People often play cricket on an oval field that contains a rectangular "pitch," measuring 22 yards by 10 feet (see Encyclopædia Britannica, cricket, https://www.britannica.com/sports/cricket-sport/Technical-development [accessed Mar. 23, 2025]). Two teams of 11 players take turns either "bowling" or "batting" (id.). The bowler, like a pitcher in baseball, delivers a ball in the direction of the batter, positioned at the end of the pitch, who swings at the ball using a flat bat in an effort to score runs (id.). Players from the bowler's team stand in different sections of the field and try to catch balls that the batter's team hits (id.). As with other popular sports, people also play an informal version of cricket on streets, parking lots, and other areas not specifically designed for the game if they do not have access to a field (see e.g., Carlos Osorio, Car-Park Cricket in Canada, [*2]Reuters, Sept. 6, 2022, https://www.reuters.com/news/picture/car-park-cricket-in-canada-idUSRTSB0C9T/ [accessed Mar. 23, 2025]).[FN1]
Cricket in all its forms has a long and storied history in New York City. The Staten Island Cricket Club, founded in 1872, is the oldest active cricket club in the United States (see David Waldstein, Through It All, Staten Island Cricket Endures, NY Times, July 21, 2022 [observing that the club "is older than Major League Baseball itself"]). And cricket remains a core recreational activity in the City and surrounding communities. Last year, a 34,000-seat stadium was constructed in Nassau County to host the International Cricket Council Men's World Cup.
Plaintiff is one of the City's many cricket enthusiasts. As plaintiff detailed in his court submissions, at the time of his injury he was 45 years old and a member of a local team that played in a Queens cricket league. The league held cricket matches at different locations in Brooklyn and Queens between May and October, and plaintiff's team played between 15 and 17 matches each year. In August 2015, plaintiff's team played a match at the Lincoln Terrace/Arthur S. Somers Park ("the park") in Brooklyn. Plaintiff had played cricket one other time in the park at another league game, two years prior, but he did not remember anything of note from that game. The league used two adjacent tennis courts that did not have nets, and were therefore "open park," as a cricket field. During the game, plaintiff, who was positioned in the outfield near the park's perimeter fence and at the rear of one of the courts, suffered an injury while running to catch a ball hit by the rival team's batter. Plaintiff ran towards the right, keeping his eye on the ball, when his "right foot stepped into a hole and [he] stumbled," crashing into the perimeter fence. The hole was three to four inches deep and six to eight inches wide, and it was nested inside a larger fissure that was around seven feet long, extending "[a]ll between the tennis court and the [surrounding] asphalt." Some segments of the fissure appeared to be filled in with cement, but others contained holes like the one that caused plaintiff's fall.
Plaintiff filed a personal injury action against defendants, alleging, in relevant part, that: (1) defendants owed a duty to the public to maintain safe conditions in the park; (2) he was injured by an "uneven, misleveled, raised, cracked, defective, dangerous, hazardous and unsafe condition" in the park; and (3) defendants negligently "failed to provide for the safety . . . and protection of the general public," by their "improper maintenance and repairs of the [p]ark." Plaintiff further alleged in his bill of particulars that his injuries included a fractured tibia that required surgery, where doctors inserted a steel rod between plaintiff's knee and ankle, along with metal screws and clamps.
After discovery, defendants moved for summary judgment, arguing that the conditions in the park were open and obvious and that plaintiff therefore assumed the risk of playing on their property. Plaintiff opposed the motion, responding that the primary assumption of risk defense did not apply because defendants' failure to remedy the dangerous condition of the park unreasonably increased the risk of injury beyond what was inherent in recreational activity. Plaintiff further argued that the primary assumption of risk defense "does not exculpate a landowner from ordinary negligence in maintaining its premises."
In support of his opposition, plaintiff submitted his own deposition testimony as well as a report from an expert who reviewed contemporaneous photographs of the fissure.[FN2] According to plaintiff's expert, the chief mechanical engineer at a consulting and forensics engineering firm, the fissure was the result of "long term exposure to the elements, repetitive cycles of freezing and thawing, and differential expansion and contraction." The unpaved holes in the fissure were deeper and wider than the "generally accepted industry standards for safe walking surfaces." [*3]In publicly available historical aerial imagery of the park from as early as 2006, nine years before the accident, the expert could observe that the fissure cut through the tennis court even then. The expert report included some of both the contemporaneous and historical pictures. Plaintiff's expert also reviewed inspection records available on the Parks and Recreation Department's website. Those records showed that city inspectors deemed the pavement in the park "unacceptable" ten times, including on September 9, 2014, one year before the accident, and August 20, 2015, fewer than two weeks after the accident.
Plaintiff also submitted the deposition testimony of one of defendants' employees, a permanent park supervisor at the Parks and Recreations Department who was previously assigned to inspect the park. The supervisor could not recall how many times they inspected the park during their tenure, only that they did so "more than once," and maybe fewer than 10 times. They were unaware of plaintiff's accident, and when plaintiff's counsel presented them with photographs of the fissured pavement in the park, they claimed that they did not recognize the ground because "any time they inspected this, it was the winter so it was covered." The supervisor admitted that the pictures of the fissured pavement "look[ed] like a mess," but contended that they would "have to physically be there to see everything." Further, the supervisor asserted that a crack in a paved surface must be a "specific size" before reporting it, but when questioned, they could not recall what size triggered that reporting requirement. Plaintiff also submitted inspection records and work orders for the park covering a "zone" that did not include the courts, including a document where, fewer than three months before plaintiff's injury, the supervisor deemed the pavement "unacceptable."
Supreme Court granted defendants' motion for summary judgment. The Appellate Division affirmed, reasoning that the primary assumption of risk doctrine applies to risks in sports and recreational activities created by open and obvious conditions, and because the fissure was "clearly visible," plaintiff failed to raise a triable issue of fact (200 AD3d 769, 769 [2d Dept 2021]). Two Justices concurred on constraint (id. at 771-772 [Duffy, J., concurring]). They argued that the primary assumption of risk doctrine was not intended to shield landowners from liability when they allow their property "to fall into a neglectful state of disrepair, completely relieving [them] of any duty to sports participants" (id.).
The Appellate Division granted plaintiff's motion for leave to appeal and certified the question of whether its decision and order were properly made (2023 NY Slip Op 69163[U]). I would answer that question in the negative, because under the Court's precedent, the primary assumption of risk doctrine does not insulate owners of sports and recreational venues from liability for ordinary negligence in maintaining their premises in a reasonably safe condition.
II.
A.
Plaintiff argues that granting summary judgment was improper because the primary assumption of risk doctrine does not apply to defects resulting from a landowner's negligent maintenance of their property and creating risks that are not inherent in recreational activity. He further argues that the Appellate Division's holding propagates unsound public policy by shielding landowners who allow their property to fall into a state of disrepair. Defendants respond that the Court's precedent requires application of the primary assumption of the risk doctrine because the risks created by "suboptimal" conditions on an outdoor field are inherent to outdoor recreational activity. Defendants also argue that applying the doctrine serves valuable public policy ends by protecting owners of recreational facilities from cost-prohibitive liability. Plaintiff is correct on the law, and defendants' public policy argument falls flat.
"On a motion for summary judgment, facts must be viewed in the light most favorable to the non-moving party. The movant must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Once this showing has been made, . . . the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which [*4]require a trial of the action" (Bazdaric v Almah Partners LLC, 41 NY3d 310, 316 [2024] [internal quotation marks and citations omitted]).
Summary judgment is a "drastic remedy [that] should not be granted where there is any doubt as to the existence of such issues" (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]; see also Vega v Restani Const. Corp., 18 NY3d 499, 503 [2012] ["Summary judgment is a drastic remedy, to be granted only where the moving party has tender(ed) sufficient evidence to demonstrate the absence of any material issues of fact"] [internal citations and quotation marks omitted]). "Negligence cases by their very nature do not usually lend themselves to summary judgment, since often, even if all parties are in agreement as to the underlying facts, the very question of negligence itself is a question for jury determination" (Ugarriza v Schmieder, 46 NY2d 471, 474 [1979]). Moreover, "the assumption of risk to be implied from participation in a sport with awareness of the risk is generally a question of fact for a jury" (Maddox v City of New York, 66 NY2d 270, 279 [1985]).
For the reasons I discuss, the assumption of risk doctrine is not a complete defense to plaintiff's negligence action, which is based on defendants' alleged failure to maintain the park in a reasonably safe condition for purposes of sport and recreational activities. "Our precedents do not go so far as to exculpate sporting facility owners of this ordinary type of alleged negligence" (Morgan v State of New York, 90 NY2d 471, 488-489 [1997]).
B.
In 1975, the Legislature adopted CPLR 1411 "to abolish contributory negligence and assumption of risk as absolute defenses in favor of a comparative fault regime" in tort cases (Custodi v Town of Amherst, 20 NY3d 83, 87 [2012]).[FN3] Despite the statute's plain language, and the justifications articulated in its legislative history for abandoning the State's prior draconian tort regime in exchange for a modern framework, the Court has developed a policy-based jurisprudence that limits liability of certain defendants under a so-called "primary assumption of risk" doctrine.[FN4]
Under the doctrine, a defendant in a personal injury action may assert as an absolute defense that they owed no duty of care to a plaintiff who engages in "certain types of athletic or recreational activities" and as such " 'consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation' " (Custodi, 20 NY3d at 87-88, quoting Morgan, 90 NY2d at 484). As the Court has recognized, the doctrine "does not, and cannot, sit comfortably with comparative causation [and] its retention is most persuasively justified not on the ground of doctrinal or practical compatibility, but simply for its utility in 'facilitat[ing] free and vigorous participation in athletic activities' " (Trupia v Lake George Cent. School Dist., 14 NY3d 392, 395 [2010], quoting Benitez v New York City Bd. of Educ., 73 NY2d 650, 657 [1989] and citing Morgan, 90 NY2d at 484 and Turcotte v Fell, 68 NY2d 432, 439 [1986]).
The Court has attempted to limit the potential for overbroad application of the doctrine, explaining that it "must be closely circumscribed if it is not seriously to undermine and displace the principles of comparative causation" (id.). Accordingly, the Court has cabined the primary assumption of risk doctrine to "personal injury claims arising from sporting events, sponsored athletic and recreative activities or athletic and recreational pursuits that take place at designated venues" (Custodi, 20 NY3d at 89). Additionally, a plaintiff is "not deemed to have assumed risks resulting from the reckless or intentional conduct of others, or risks that are concealed or unreasonably enhanced" (id. at 88 [internal citation omitted]). Nor is the doctrine a bar to claims of "negligent conditions occurring in the ordinary course of any property's maintenance" (Morgan, 90 NY2d at 488).
Thus, the primary assumption of risk doctrine did not displace the core tort rule that a landowner is potentially liable for failure to maintain their recreational facilities in a reasonably safe condition (see Henry v Hamilton Equities, Inc., 34 NY3d 136, 142 [2019] ["Landowners generally owe a duty of care to maintain their property in a reasonably safe condition, and are liable for injuries caused by a breach of this duty"] [internal citations omitted]; Gronski v County of Monroe, 18 NY3d 374, 379 [2011] [explaining that a landowner who exercises control over their property is "best able to identify and prevent any harm to others"] [internal citations and quotation marks omitted]; see also Restatement [Third] of Torts § 51 ["(A) land possessor owes a duty of care to entrants on the land with regard to . . . conduct by the land possessor that creates risks to entrants on the land . . . (and) natural conditions on the land that pose risks to entrants on the land"]).
C.
Over the years, jurists have expounded thoughtful critiques of how lower courts have misapplied the primary assumption of risk doctrine in cases implicating ordinary negligence in maintaining property, against the Court's limiting principles. In the Second Department in particular, it is commonplace for Justices to concur "on constraint" by their own precedent, or to dissent, from majority decisions applying the primary assumption of risk doctrine to injuries caused by negligently maintained premises hazards. In the decision below, for example, the concurring Justices asserted that the fissure in the park "was not a risk inherent in the sport of tennis or cricket," and instead may constitute "an allegedly negligent condition occurring in the ordinary course of any property's maintenance" that invoked "typical comparative negligence principles" (200 AD3d at 772 [internal quotation marks and citations omitted]). Applying the primary assumption of risk doctrine in such cases "plac[es] undue emphasis on the plaintiff's knowledge of the alleged dangerous condition" and, by consequence, "improperly relieves landowners of their general duty to maintain their property in a reasonably safe condition" (id. [internal citations and quotation marks omitted]). Other Justices have similarly argued that, against the Court's precedent, lower courts have placed undue and unwarranted emphasis on the sole fact that the plaintiff was aware of a risk and failed to properly consider whether the risk is inherent to the recreational activity (see e.g., Philius v City of New York, 161 AD3d 787, 799 [2d Dept 2018] [Connolly, J., concurring on constraint with the majority's holding that the plaintiff assumed the risk of tripping on a crack in the surface of a public housing authority's outdoor basketball court, and explaining that the focus of the primary assumption of risk doctrine is on whether a risk is inherent in a sport, and not a plaintiff's "knowledge of the defect" in a playing surface]; Palladino v Lindenhurst Union Free School Dist., 84 AD3d 1194, 1199 [2d Dept 2011] [Skelos, J., concurring on constraint with the majority's holding that the plaintiff's 11-year-old son assumed the risk of tripping on an "improperly placed grate" while playing handball at a public high school court and arguing that if a plaintiff's knowledge of a defect leads to the "automatic negation of a landowner's duty in such circumstances (it) would give landowners license to allow properties, upon which sporting and recreational activities are held, to fall into disrepair"]).
These cases reveal a pattern of lower courts' misapplication of the primary assumption of risk doctrine to limit liability of landowners, despite the Court's warning that the doctrine must be "closely circumscribed" (Trupia, 14 NY3d at 395). Indeed, the Court's caselaw has long distinguished between risks inherent to the athletic activity that are known and obvious, and conditions of the venue that are "not sufficiently interwoven into the assumed inherent risk" of the activity and thus constitute negligence in the "ordinary course of any property's maintenance" (Morgan, 90 NY2d at 488). Rather than affirm this distinction and correct the confusion in the courts below, the majority ignores our jurisprudence without explanation and perpetuates the problem.
III.
I summarize here the cases that establish this distinction and control our analysis on this appeal. Morgan involved four consolidated appeals where the landowner and operator defendants sought dismissal on the ground that the plaintiffs had assumed the risks from the conditions that allegedly caused their injuries. The plaintiff in Morgan was injured while bobsledding on a course that the State owned and operated (id. at 479). The plaintiff's bobsled tipped over because of a steering error, and his partner fell out (id. at 480). After the bobsled crossed the finish line of the course, the plaintiff was unable to reach the brakes or slow down the bobsled without his partner (id.). The bobsled "crashed into a concrete abutment" on the course's exit run (id.). In court, the plaintiff argued that the course's exit ramp was negligently designed, and he prevailed at trial (id. at 481). On appeal, the Appellate Division dismissed the plaintiff's claim (id.). This Court affirmed, reasoning that the primary assumption of risk doctrine applied because "[t]he accident in this case was solely the result of dangers and calculations inherent in a highly dangerous sport and not the result of any demonstratable defect in the design of the bobsled course itself" (id. at 486).
In Beck v Scimeca and Chimerine v World Champion John Chung Tae Kwon Do Inst., decided along with Morgan, the plaintiffs were injured during their respective martial arts classes. In Beck, the plaintiff, who had been a student at the karate school for around 15 months and achieved an orange belt, was injured "attempting to perform a 'jump roll' tumbling technique over an obstacle" (Morgan, 90 NY2d at 481). The defendant, who was the plaintiff's instructor and owned the karate school, had left the classroom and placed a 15-year-old—the "highest ranking student"—in charge, and that student raised the height of the obstacle that caused the plaintiff's injury (id.). The plaintiff alleged that the defendant was negligent in allowing a teenager to supervise the class, in placing the obstacle at a higher level, and in failing to install sufficiently thick mats to cushion his fall (id. at 486-487). In Chimerine, the plaintiff sustained injuries from attempting "a 'jumping' or 'hopping' kick maneuver" (id.). She asserted that as she had only attended three prior martial arts classes, she did not understand "the risks inherent in martial arts training" (id. at 488). The Court affirmed dismissal of both plaintiffs' claims on summary judgment, concluding that each plaintiff assumed the risk of injury: in Beck, from landing incorrectly, and in Chimerine, from a failed jump kick maneuver (id. at 487-488). Notably, in Beck, the Court held that the teenage student allegedly placing the obstacle at a higher level—a "circumstance of which the plaintiff was plainly aware"—did not create a triable issue of fact, because "[t]he primary means of means of improving one's sporting prowess and the inherent motivation behind participation in sports is to improve one's skills by undertaking and overcoming new challenges and obstacles" (id. at 487).
In the fourth consolidated appeal, Siegel v City of New York, the plaintiff tripped while playing tennis at an indoor club that the City owned and leased out (id. at 482). The plaintiff "snagged his foot in a torn vinyl hem at the bottom of a net" that divided one tennis court from another (id.). He played at the club once a week and had known about the torn divider net for at least two years, and he was further aware that other club members had complained about it to management, apparently to no avail (id.). The Court held that granting the defendant's summary judgment motion was improper, because the torn divider net was not a risk inherent to tennis and the plaintiff therefore did not assume the risk of tripping on it when he played tennis on the defendant's property (id. at 488). Although divider nets may be an inherent component of indoor sports facilities, the Court reasoned that "a torn or allegedly damaged or dangerous net—or other safety feature—is by its nature not automatically an inherent risk of a sport . . . Rather, it may . . . constitute an allegedly negligent condition occurring in the ordinary course of any property's maintenance and may implicate typical comparative negligence principles" (id.). The Court further observed that the issue "boils down to whether [the] defendants . . . had a continuing duty to players to keep the net in good repair," and held "that they may in these circumstances . . . because a torn net is not sufficiently interwoven into the assumed inherent risk category" (id.).
In Sykes v County of Erie (94 NY2d 912 [2000]), the plaintiff suffered a knee injury when he stepped into a recessed drain while playing on an outdoor basketball court. The Court affirmed dismissal of plaintiff's action, reasoning that he assumed the risk of injury, given that the condition was open and obvious and that irregular surfaces are inherent to outdoor basketball (id. at 913). The Court reaffirmed that "the doctrine of assumption of risk does not exculpate a landowner from liability for ordinary negligence in maintaining a premises," but nevertheless concluded [*5]that dismissal was proper because the plaintiff proffered "no evidence that the drain was defective or improperly maintained" (id.). Thus, Sykes confirms that negligent maintenance of a playing surface is actionable under ordinary tort principles even if the condition is observable, when a plaintiff makes a showing that the defendant's alleged negligence created a dangerous condition that is not inherent to a recreational activity.
Maddox is not to the contrary. There, the plaintiff injured his knee when he slipped and fell on a muddy baseball field at Shea Stadium (66 NY2d at 275). The plaintiff was a professional baseball player who had complained to the groundskeepers about the muddy conditions. The Court held that the plaintiff assumed the risk of his injuries (id. at 277). It explained that "[t]he risks of a game which must be played upon a field include the risks involved in the construction of the field" (id.). As anyone who has observed or played on a grassy outdoor field knows, mud forms even with proper drainage. Therefore, Maddox further confirms that a premises owner is not absolutely immune from liability for those conditions that are not inherent to the playing surface and result instead from the owner's failure to reasonably maintain the premises.
No reference in the Court's caselaw to plaintiffs having assumed the risk of "suboptimal conditions" put this clear tort principle in question (see e.g., Bukowski v Clarkson Univ., 19 NY3d 353 [2012]). Suboptimal means "not at the best possible level" (Merriam-Webster Online Dictionary, suboptimal [https://www.merriam-webster.com/dictionary/suboptimal]), and no person can expect that a playing surface will be perfectly even or without some irregularity based on the nature of the surface itself, whether it is grass, concrete, or asphalt. "Suboptimal conditions" cannot include a surface that has deteriorated to the point that it creates an obstacle course that poses a significant risk of injury and interrupts the flow of the athletic activity.
As the decisions in Morgan show, the Court has applied the primary assumption of risk doctrine to some open and obvious risks, but not to others. This is because the scope of a landowner's duty is always measured by the primary assumption of risk doctrine's justifying social policy: "[t]he balance struck at the threshold duty stage of responsibility and adjudication is that the tort rules support a social policy to 'facilitate free and vigorous participation in athletic activities'" (Morgan, 90 NY2d at 484 [internal citations omitted]). As the Court has explained, a premises owner "owes the same general duty to those using its property as to owners of real property generally, the duty to exercise 'reasonable care under the circumstances' " (Turcotte, 68 NY2d at 442, quoting Akins v Glens Falls City School Dist., 53 NY2d 325, 329 [1981]). However, the level of care varies "depending on the party seeking relief and [their] purpose in being on the premises" (id.). In other words, a plaintiff's mere participation in or presence at a sports or recreational activity does not automatically vitiate the landowner's duty of care. Instead, a court must consider several factors to determine whether a party consented to the conditions that might, under the circumstances of the case, justify a complete defense to the owner's liability for alleged negligence. In Turcotte, a case involving an injury caused by the plaintiff jockey's fall during a professional horserace, the Court considered as relevant to its holding that the plaintiff assumed the risk of their injury "the nature of professional horseracing and the facilities used for it, the playing conditions under which horseracing is carried out, the frequency of the track's use and the correlative ability of the owner to repair or refurbish the track, and the standards maintained by other similarly used facilities" (id. at 442). Consistent with the primary assumption of risk doctrine, these factors determined whether the risk of the plaintiff's injury was inherent to the sport of horseracing. As the Court has repeatedly affirmed, "for purposes of determining the extent of the threshold duty of care, knowledge plays a role but inherency is the sine qua non" (Morgan, 90 NY2d at 484).
Synthesizing the relevant principles from the Court's caselaw, the primary assumption of risk doctrine does not apply to "an allegedly negligent condition occurring in the ordinary course of any property's maintenance" (Morgan, 90 NY2d at 488), even when the condition is open and obvious, if it: (1) is not the type of condition typically found on similar premises; (2) exceeds what any reasonable person would consider mere wear and tear that causes minimal impact on the playing surface; (3) is a danger unrelated to the inherent risks of the sport or recreational activity; (4) results from disrepair caused by a lengthy period of neglect; and (5) may be repaired in the ordinary course of maintenance as illustrated by the level of care of other similar properties.
IV.
Applying these established principles of tort law easily resolves this appeal. As in Siegel, "the issue boils down to whether defendants here had a continuing duty [ ] to keep the [premises] in good repair" (Morgan, 90 NY2d at 488). They did, and therefore Supreme Court should have denied defendants' motion for summary judgment.
Plaintiff showed, through testimony, an expert report, and pictures, that there was a gaping fissure in the park that was far more severe than the ordinary irregularities one would expect on an outdoor surface. The fissure was around seven feet long, laden with holes that created tripping hazards, and ran through the one of the park's tennis courts. Defendants try to minimize the deterioration of their property, even while they acknowledge that plaintiff tripped over a large crack and do not explain the efforts they took to minimize its danger over the years. Indeed, their own witness who had been tasked with supervising the park professed unfamiliarity with the fissure, despite plaintiff's proof that it had long existed. The fissure was inherently dangerous to anyone on the premises, whether they were playing cricket or tennis, running, or merely walking; it was therefore wholly unrelated to the nature of playing cricket or any other athletic activity. If anything, the fissure would make it more difficult to play an activity such as cricket or tennis in the park, because in addition to creating a tripping hazard, it could interfere with balls that hit it in a manner wholly distinct from a ball landing on a properly maintained surface. Further, the fissure simply cannot be dismissed as mere wear and tear with minimal impact. Plaintiff submitted an expert opinion, undisputed by defendants, that the conditions developed due to negligent upkeep that persisted over years. Unquestionably, the conditions of the courts should, and could have been, repaired in the ordinary course of maintenance of this parkland.
This appeal is indistinguishable from Siegel, except that defendants have an even weaker argument for application of the primary assumption of risk doctrine here. In Siegel, the plaintiff who tripped had played on the court with the torn net once a week for the two years he had known about the defect (90 NY2d at 482). In stark contrast, plaintiff had only played cricket at the park once, two years previously, and he asserted during deposition that he did not notice the fissure at that time. In Siegel, the Court acknowledged "that nets separating indoor tennis courts . . . are inherently part of the playing and participation of the sport at such facilities" (id. at 488). Still, the Court concluded that a torn net "is by its nature not automatically an inherent risk of a sport as a matter of law for summary judgment" (id.). The same reasoning applies with equal force to this appeal. Tripping over a fissure resulting from years of neglect is not an inherent part of playing outdoor sports. To the contrary, it is an inherent danger to any use of the courts. A player who is running backwards, with eyes focused in front or above, to hit an oncoming tennis or cricket ball, faces an unreasonable risk of harm.
For these reasons, defendants have not met the "heavy" burden that summary judgment motions impose (William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475 [2013] [internal citations omitted]). Granting this "drastic remedy" was error, and I would therefore reverse and answer the certified question in the negative.
V.
Absolving defendants of liability for negligent premises maintenance does not further the social policy that animates the primary assumption of risk doctrine. It disincentivizes an owner from engaging in necessary repairs to keep their property safe and, in turn, discourages members of the public from using them. These consequences most severely affect low-income New Yorkers who do not have the resources to play at private, well-maintained facilities. No one wants to play on a decrepit, unsafe surface. And lower economic status should not be a barrier to enjoying the socially beneficial activities that the primary assumption of risk doctrine ostensibly protect.
Defendants hyperbolically claim that allowing plaintiff to pursue his negligence action would expose the City to "millions in litigation costs" for "every pavement crack." Setting aside that this case includes a seven-foot-long fissure and not a mere "pavement crack," the Court has already recognized that primary assumption of risk does "not exculpate sporting facility owners of this ordinary type of alleged negligence" (Morgan, 90 NY2d at 489), and defendants fail to explain why the Court should depart from this precedent. Defendants also fail to explain why CPLR 1411 does not sufficiently mitigate the City's potential liability even without the primary assumption of risk doctrine, as it would for any other alleged tortfeasor, by allowing it to claim that plaintiff was partially at fault for his injuries and, if successful, thereby reduce any damage award. Lastly, and not insignificantly, defendants' claim about opening [*6]the floodgates to liability holds true only if the City has left its properties in extreme disrepair, rising to the level of negligent maintenance. If that is the case, then the problem is not with the doctrine, but with the City's management of our public spaces. Consideration of such matters of executive inaction, policy priorities, and accountability to neighborhood communities are solely left to legislators, not judges (see People v Jones, 26 NY3d 730, 741 [2016] ["These policy determinations are beyond our authority and instead best left for the (L)egislature"] [internal citations omitted]; People v Francis, 30 NY3d 737, 751 [2018] ["The constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions"]).
VI.
According to defendants, players and bystanders who suffer injuries resulting from their alleged failure to maintain sport and recreational facilities within their supervision have no recourse. But "playing at your own risk" does not mean a landowner gets a free pass, completely absolved of any responsibility for failing to maintain their premises in a condition safe for athletic activities. We have not previously "exculpate[d] sporting facility owners of this ordinary type of alleged negligence" (Morgan, 90 NY2d at 488-489), and the majority's decision to do so now is contrary to established tort principles. There is no social benefit to incentivizing the disintegration of our public spaces. I dissent.
Order affirmed, with costs, and certified question answered in the affirmative, in a memorandum. Chief Judge Wilson and Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided April 15, 2025

Footnotes

Footnote 1: There is a long history in New York City of adapting concrete and asphalt surfaces for recreational sports. For example, people played stickball, a version of baseball that uses a rubber ball and a sawed-off broomstick handle rather than expensive equipment, on City streets, particularly in the Bronx, beginning in the 1920s. The streets made a popular sport accessible to New Yorkers of all backgrounds without need for a formal sports venue (see R. B. Dandes, For These Boys of Summer, the Game is Stickball, NY Times, May 5, 1985).

Footnote 2: The expert personally inspected the park over one year after the incident and observed that the courts "had been completely reconstructed since the accident with new asphalt pavement," and were not "an accurate representation" of the condition of the courts at the time of plaintiff's accident. The expert's analysis was therefore largely based on the photographs and other records.

Footnote 3: Section 1411 states, in relevant part:
"In any action to recover damages for personal injury . . . the culpable conduct attributable to [a] claimant . . . including . . . assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to [a] claimant . . . bears to the culpable conduct which caused the damages" (CPLR 1411).

Footnote 4: I have comprehensively discussed how our adoption and continued retention of the primary assumption of risk doctrine lacks legal and factual support, and I have argued that the Court should abandon the doctrine in order to apply CPLR 1411 as intended (see Grady v Chenango Val. Cent. Sch. Dist., 40 NY3d 89, 100 [2023] [Rivera, J., concurring in part and dissenting in part]). Here, I dissent because the Court's vestigial primary assumption of risk doctrine, such as it is, does not apply to plaintiff's negligent maintenance claim in the first place (see Sections III-IV, infra).